**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA and the STATES OF COLORADO, DELAWARE, FLORIDA, GEORGIA, INDIANA, ILLINOIS, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, NEW HAMPSHIRE, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, and VIRGINIA, and the DISTRICT OF COLUMBIA *ex rel.*** | 1:20CV970 |
| | **COMPLAINT** J. COLE |
| **MAUREEN GEARHART and LAURA GRIFFIETH** | ***Filed Under Seal Pursuant To 31 U.S.C. § 3730(b)(2) and State False Claims Act Provisions*** |
| **BRINGING THIS ACTION ON BEHALF OF THE UNITED STATES OF AMERICA, THESE STATES, AND THE DISTRICT OF COLUMBIA** | |
| *Plaintiffs and Relators,* | ***Do Not Serve*** ***Do Not Put On PACER*** |
| v. | |
| **Remedi SeniorCare Holding Corporation** **One Olympic Place, Suite 600** **Towson, MD 21204** | |
| **Agent: CSC-Lawyers Incorporating Service Co.** **7 St. Paul Street, Suite 820** **Baltimore, MD 21202** | |
| **and,** | |
| (*Additional Defendants listed on next page*) | |

FILED
RICHARD W. NAGEL
CLERK OF COURT
20 DEC -2 PM 1:28
U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

Remedi Healthcare Services, LLC :
One Olympic Place, Suite 600 :
Towson, MD 21204 :

Agent: Corporation Service Co. :
50 West Broad Street, Suite 1330 :
Columbus, OH 43215 :

and, :

Remedi SeniorCare of Ohio, LLC :
f/k/a Remedi Healthcare :
One Olympic Place, Suite 600 :
Towson, MD 21204 :

Agent: Corporation Service Co. :
50 West Broad Street, Suite 1330 :
Columbus, OH 43215 :

and, :

Remedi SeniorCare of Ohio-Northeast, LLC :
f/k/a Remedi SeniorCare of Florida, LLC :
One Olympic Place, Suite 600 :
Towson, MD 21204 :

Agent: Corporation Service Co. :
50 West Broad Street, Suite 1330 :
Columbus, OH 43215 :

and, :

Remedi SeniorCare of Colorado, LLC :
8971 N. Harlan Street :
Westminster, CO 80031 :

Agent: CSC-Lawyers Incorporating :
Service Co. :
7 St. Paul Street, Suite 820 :
Baltimore, MD 21202 :

and, :

(*Additional Defendants listed on next page*) :

Remedi SeniorCare of Dallas, LLC :
2700 Research Drive :
Plano, TX 75074 :

Agent: CSC-Lawyers Incorporating Service Co. :
7 St. Paul Street, Suite 820 :
Baltimore, MD 21202 :

and, :

Remedi SeniorCare of Houston, LLC :
16601 Central Green Boulevard :
Houston, TX 77032 :

Agent: CSC-Lawyers Incorporating Service Co. :
7 St. Paul Street, Suite 820 :
Baltimore, MD 21202 :

and, :

Remedi SeniorCare of Maryland, LLC :
f/k/a Woodhaven Pharmacy Services, LLC :
One Olympic Place :
Suite 600 :
Towson, MD 21204 :

Agent: CSC-Lawyers Incorporating Service Co. :
7 St. Paul Street, Suite 820 :
Baltimore, MD 21202 :

and, :

Remedi SeniorCare of Michigan, LLC :
14700 Helm Court :
Plymouth, MI 48170 :

Agent: Corporation Service Co. :
50 West Broad Street, Suite 1330 :
Columbus, OH 43215 :

and, :

(*Additional Defendants listed on next page*) :

Remedi SeniorCare of Oklahoma, LLC :
One Olympic Place, Suite 600 :
Towson, MD 21204 :

Agent: CSC-Lawyers Incorporating :
Service Co. :
7 St. Paul Street, Suite 820 :
Baltimore, MD 21202 :

and, :

Remedi SeniorCare of Pennsylvania, LLC :
f/k/a Remedi SeniorCare of Michigan, LLC :
One Olympic Place, Suite 600 :
Towson, MD 21204 :

Agent: CSC-Lawyers Incorporating :
Service Co. :
7 St. Paul Street, Suite 820 :
Baltimore, MD 21202 :

and, :

Remedi SeniorCare of Tampa, LLC :
One Olympic Place, Suite 600 :
Towson, MD 21204 :

Agent: Corporation Service Co. :
50 West Broad Street, Suite 1330 :
Columbus, OH 43215 :

and, :

Remedi SeniorCare of Virginia, LLC :
One Olympic Place, Suite 600 :
Towson, MD 21204 :

Agent: CSC-Lawyers Incorporating :
Service Co. :
7 St. Paul Street, Suite 820 :
Baltimore, MD 21202 :

*Defendants.* :

## Table of Contents


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 8

III. THE FALSE CLAIMS ACT ..... 8

IV. PARTIES ..... 10

V. GOVERNMENT HEALTHCARE PROGRAMS ..... 18

A. Medicare Part D ..... 18

B. Federal & State Funded Medicaid Program ..... 27

C. TRICARE ..... 31

VI. VALID PRESCRIPTIONS UNDER STATE LAW ..... 34

A. Basic Prescription Requirements ..... 35

B. Prescription Validity Requirements for Refilling Drugs ..... 36

C. The Residents of Assisted Living Facilities and the Other Residential Facilities at Issue in This Complaint Do Not Receive Daily Medical Care ..... 39

VII. REMEDI KNOWINGLY CLAIMS PAYMENT FROM GHPS FOR DISPENSING INVALID PRESCRIPTIONS ..... 40

A. Remedi Designed Its Computerized Dispensing and Billing Systems to Submit False Claims for Medication Dispensed With Expired or Otherwise Invalid Prescriptions ..... 40

1. Remedi Designs its Paxit and Framework Systems to Auto-Dispense Expired and Exhausted Prescription Drugs. ..... 40

2. Remedi Designed Its Computer Systems to Falsify Claims ..... 45

a) Remedi stores copies of prescriptions in Framework and DocuTrack ..... 45

b) Remedi designed Framework to display false data about the prescriptions ..... 45

c) Remedi enters the false data into its claims for payment ..... 46

d) Remedi fails to state truthful data it keeps about the prescriptions on its claims ..... 47

B. Other Invalid Prescriptions ..... 48

1. Remedi Falsifies Prescription Labels to Dispense Drugs Lacking a Valid Prescription .......... 49

2. Remedi Fails to Dispense as Directed by Prescribers .......... 50

3. Remedi Dispenses Under Documentation That Lacks Basic Prescription Requirements .......... 51

C. Relators Observe Other Facts Indicating Remedi Knew It Was Submitting False Claims .......... 54

1. Relator Griffieth Observed Remedi Change Its Computer Systems to Remove the Hard Stop That Prevented the Filling of Expired and Exhausted Prescriptions 54

2. Remedi's Corporate Mindset of Disregarding Invalid Prescriptions Leads to Further Creation of Fake Prescriptions .......... 56

3. Remedi Talks About Changing its Processes Only After Its Competitor Was Sued for Identical False Claims Act Violations .......... 58

4. Relators Learn More About Remedi's Misconduct .......... 59

D. Representative Example False Claims .......... 64

1. Patient 1 .......... 64

2. Patient 2 .......... 68

3. Patient 3 .......... 71

4. Patient 4 .......... 74

5. Patient 5 .......... 78

VIII. False Claims to Government Healthcare Programs for Drugs Already Paid for by Government Health Care Programs as Part of the Skilled Nursing Facility or Hospice Benefit .......... 81

A. Representative Example False Claims .......... 87

1. Patient 6 .......... 88

2. Patient 7 .......... 91

COUNT ONE: 31 U.S.C. § 3729(a)(1)(A) .......... 93

COUNT TWO: 31 U.S.C. § 3729(a)(1)(B) .......... 94

COUNT THREE: 31 U.S.C. § 3730(h) .......... 95

COUNT FOUR: Ohio R.C. Chapter 4112 .......... 102

COUNT FIVE: Colorado .......... 103

COUNT SIX: Delaware .......... 104

COUNT SEVEN: District of Columbia .......... 105

COUNT EIGHT: Florida .......... 106

COUNT NINE: Georgia .......... 107

COUNT TEN: Illinois .......... 108

COUNT ELEVEN: Indiana .......... 109

COUNT TWELVE: Louisiana .......... 110

COUNT THIRTEEN: Maryland .......... 111

COUNT FOURTEEN: Michigan .......... 112

COUNT FIFTEEN: Minnesota .......... 112

COUNT SIXTEEN: New Hampshire .......... 113

COUNT SEVENTEEN: Oklahoma .......... 114

COUNT EIGHTEEN: Rhode Island .......... 115

COUNT NINETEEN: Tennessee .......... 116

COUNTY TWENTY: Texas .......... 117

COUNT TWENTY ONE: Virginia .......... 118

PRAYER FOR RELIEF .......... 119

## I. INTRODUCTION

1. Relators Maureen Gearhart and Laura Griffieth bring this action on behalf of the United States and the Plaintiff States to recover damages and civil penalties under the Federal False Claims Act, 31 U.S.C. §§ 3729–3733, and similar State False Claims Acts. Defendant Remedi SeniorCare Holding Corporation and its subsidiaries who are acting under its control and are named as Defendants in this action ("**Remedi**") are knowingly submitting and causing the submission of false claims for payment to Government Healthcare Programs ("**GHPs**") for prescription medication dispensed with expired or otherwise invalid prescriptions to residents of assisted living facilities and other residential facilities that do not provide daily medical care.

2. Specifically, Remedi knowingly submits claims for payment for prescription drugs based on prescriptions that: (1) are expired under state law, (2) are expired due to the physician's (or other prescriber's) directive on the prescription, (3) are exhausted because the patient has already received all refills authorized by their physician, or (4) do not meet other regulatory and statutory requirements. When prescriptions are expired or all authorized refills have been exhausted, the prescriptions are no longer valid. For the health and safety of their beneficiaries, GHPs do not permit payment to pharmacies for dispensing prescription medication without a valid prescription.

3. Remedi began its scheme of knowingly issuing medication to GHP beneficiaries based on expired or otherwise invalid prescriptions in or around 2009 and this practice continues to the present.

4. Remedi carries out or has carried out this scheme at its pharmacies and offices in the states of Colorado, Florida, Maryland, Michigan, Pennsylvania, Ohio, Oklahoma, Texas, and Virginia by dispensing medication from its pharmacies in these

states.

5. Remedi's fraudulent conduct also extends to Alaska, Arizona, Delaware, Georgia, Indiana, Illinois, Louisiana, Maine, Minnesota, Missouri, New Hampshire, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, West Virginia, Wisconsin and the District of Columbia, because Remedi also fills expired or otherwise invalid prescriptions for residents of these states and submits claims for payment to GHPs for residents of those states.

6. In or around 2009, Remedi began switching its drug dispensing system for oral noncontrolled substances to a new system called "Paxit," which is an automated prescription dispensing system that dispenses doses daily. At the same time, Remedi had programmed a new pharmacy software system that handles billing and other tasks, called "Framework." Before 2009, Remedi's existing dispensing and billing system would **not** automatically process expired or exhausted prescriptions. Nevertheless, Remedi set up Paxit and Framework to automatically dispense and then bill GHPs for prescription drugs when Remedi knew that the underlying prescription was expired or exhausted. The new computer systems have no "hard stop" to prevent Paxit from dispensing expired and exhausted prescriptions. Nor do they alert Remedi's employees that a prescription was close to expiring or exhausting refills.

7. Instead, Remedi designed Paxit to auto dispense daily, prioritizing billing without regard to the validity of the prescription or to GHP concerns for patient health and safety.

8. Remedi auto-dispensed medications with expired or otherwise invalid prescriptions because obtaining new prescriptions manually is time-intensive and costly. Remedi realizes increased profits when medication is dispensed to GHP patients

without interruption and without having to obtain new prescriptions.

9. Sometimes Remedi does not use Paxit to dispense medication because Paxit cannot be used to dispense non-oral drugs and a few Remedi pharmacies do not use Paxit. Even without Paxit, Remedi still dispenses prescription medication under invalid expired and exhausted prescriptions. Rather than request a new prescription, Remedi's personnel create new prescription numbers and prescription labels to conceal from GHPs the fact that there is no valid prescription. Then Remedi bills GHPs for these drugs dispensed with expired or otherwise invalid prescriptions.

10. State licensed pharmacies have a fundamental professional obligation to ensure that drugs are dispensed only under the supervision of physicians and other prescribers who monitor patients' drug therapies and outcomes. Quantity and duration limitations on prescriptions allow physicians to evaluate the continued safety and efficacy of the prescription, monitor for side effects, determine whether the prescription should be continued, and reassess the appropriate quantity and dosage.

11. The patients that Remedi's state-licensed pharmacies serve are primarily elderly, debilitated patients who are vulnerable to medication side effects. These patients should be monitored for needed adjustments or changes to their medication as they age and their medical requirements change. Many of these medications are "black box" drugs that carry serious side effects and/or increased risk of death. This makes the automatic dispensing of expired or exhausted prescriptions particularly dangerous.

12. Example classes of medication Remedi dispenses with expired or otherwise invalid prescriptions and then bills to GHPs that pose risks associated with long-term use are:

A. **Antipsychotics**: many of these drugs carry a black box warning issued by

the Food and Drug Administration to alert medical professionals of potentially serious side effects that require monitoring and evaluation. Atypical antipsychotics carry a black box warning of increased risk of mortality when used in dementia patients;

B. **Muscle relaxants**: many of these are on the "Beer's list" of medications to be avoided in the geriatric population and thus at least require monitoring and evaluation;

C. **Antihypertensives**: many of these require electrolyte/blood pressure monitoring to ensure safety and efficacy; and

D. **Antibiotics/antifungals**: the prolonged use of these medications increases the risk of superinfection and can contribute to antibiotic resistance.

13. Residents of assisted living facilities and other residential facilities at which daily medical care is not provided do not have medical staff monitoring them daily to watch for problematic side effects or to assess the efficacy and dosage of the medication. As such, the timely evaluation of the efficacy of the prescriptions and of the need for modification of the prescriptions must be performed by the prescribing medical provider as the prescription expires. Remedi's dispensing of expired prescription medication for weeks and months at a time—and sometimes over a year after prescription expiration—without consulting with the patients' physicians endangers the patients' health and safety.

14. GHPs will not pay for medication dispensed without a valid prescription. For example, Medicare Part D's regulations state that Medicare does not permit payment for prescription medication dispensed without a valid prescription. 42 C.F.R. § 423.104(h) (April 12, 2012). A valid prescription is a prescription that complies with all applicable

State law requirements constituting a valid prescription. 42 C.F.R. § 423.100 (April 12, 2012). *See also* paragraphs 86–87, 106, 136, 145, below. State laws provide that prescriptions are only valid for a specified time period after the prescription was written, usually one year, and/or that the prescription refills are not valid unless authorized by the physician or other prescriber. *See* paragraphs 154–58, below.

15. By submitting false claims for payment for prescriptions that were invalid because they were expired, because all prescriber-authorized refills were exhausted, or for other reasons, Remedi submitted or caused the submission of false claims in violation of the False Claims Act, 31 U.S.C. §§ 3729–3733.

16. Remedi's violations of Medicare's prescription requirements are material to the Government. Furthermore, as the Government has stated in its *Omnicare* case (discussed below), GHPs would not have paid claims for prescription medication knowing that a valid prescription did not exist. As contractors or subcontractors to Medicare Part D plan sponsors and participants in the Medicare, Medicaid, and TRICARE programs, Remedi knew this.

17. Remedi was also required to keep all documentation necessary to establish its entitlement to federally-funded GHP payment.

18. When Remedi did not have documents sufficient to show it was dispensing medication pursuant to a valid prescription, Remedi knew it did not meet the Government's payment requirements.

19. Because of these requirements, Remedi knew that its failure to have documentation showing that its claims satisfy GHP payment requirements naturally would tend to influence the Government's payment decision.

20. Remedi's disregard for contractual and legal requirements results in other

knowing False Claims Act violations.

21. GHPs pay skilled nursing facilities and hospices to provide certain medications to beneficiaries that use their services as part of the Medicare Part A, Medicaid, and TRICARE hospital benefits. Remedi regularly fails to bill skilled nursing facility and hospice providers as required by the GHPs. Instead, Remedi bills patients' Part D plan or other GHP prescription drug benefit program—even though Remedi has been warned that it cannot do so by Part D and Medicaid plans. This scheme results in the Government effectively paying twice for the same prescription medication.

22. Remedi's conduct also violated the analogous false claims acts and health care fraud statutes of the sixteen Plaintiff States and the District of Columbia (collectively, the "**Plaintiff States**"). Like the federal False Claims Act, these statutes (collectively, the "**State False Claims Acts**") impose liability for defined conduct in the nature of fraud, for the submission of false claims, the use of false records and documents, and the failure to disclose material information in presenting claims to each respective sovereign State's Medicaid program. The conduct of Remedi alleged in this complaint violated the following State False Claims Acts of the Plaintiff States:

A. **Colorado**: Colorado Medicaid False Claims Act, C.R.S. 25.5-4-304 to 25.5-4-310;

B. **Delaware**: Delaware False Claims and Reporting Act, 6 Del. C. §§ 1201 to 1211;

C. **District of Columbia**: District of Columbia False Claims Act, D.C. Code §§ 2-381.01 to 2-381.07;

D. **Florida**: Florida False Claims Act, Fla. Stat. §§ 68.081 to 68.092;

E. **Georgia**: Georgia Taxpayer Protection False Claims Act, O.C.G.A. §§ 23-3-120 to 23-3-127, Georgia State False Medicaid Clams Act, O.C.G.A. §§ 49-4-168 to 49-4-

168.6;

F. **Illinois**: Illinois False Claims Act, 740 ILCS 175/1 to 740 ILCS 175/8;

G. **Indiana**: Indiana False Claims Act, IC §§ 5-11-5.5-1 to 5-11-5.5-18, and the Medicaid False Claims and Whistleblower Protection Act, IC §§ 5-11-5.7-1 to 5-11-5.7-18;

H. **Louisiana**: Louisiana Medical Assistance Programs Integrity Law, La. R.S. §§ 46:437.1 to 46:440.3;

I. **Maryland**: Maryland False Health Claims Act, Md. Health-General Code Ann. §§ 2-601 to 2-611;

J. **Michigan**: Michigan Medicaid False Claims Act, MCLS §§ 400.601 to 400.615;

K. **Minnesota**: Minnesota False Claims Act, Minn. Stat. §§ 15C.01 to 15C.16;

L. **New Hampshire**: New Hampshire Medicaid Fraud and False Claims Act, N.H. Rev. Stat. §§ 167:61-b to 167:61-e;

M. **Oklahoma**: Oklahoma Medicaid False Claims Act, 63 Okla. St. §§ 5053 to 5053.7;

N. **Rhode Island**: Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 to 9-1.1-9.

O. **Tennessee**: Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 to 71-5-185.

P. **Texas**: Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001 to 36.117; and

Q. **Virginia**: Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 to 8.01-216.19.

23. Remedi also conducts or has conducted business by filling prescriptions for

residents in the states of Alaska, Arizona, Maine, Missouri, Ohio, Oregon, Pennsylvania, South Carolina, West Virginia, and Wisconsin, and has submitted or caused to be submitted false claims to the Medicaid programs of those respective states through the use of false records and statements, including by failing to disclose material information in presenting its claims. Because Medicaid is a government healthcare program jointly funded by the United States and each state, each false claim submitted or caused to be submitted by Remedi in each of those states is a false claim against the United States in violation of the False Claims Act. *See* 31 U.S.C. § 3729(b)(2)(A)(ii).

## II. JURISDICTION AND VENUE

24. This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

25. This Court has personal jurisdiction over all Defendants pursuant to 31 U.S.C. § 3732(a) because all Defendants can be found, reside, transact business, or committed acts proscribed by the False Claims Act within the State of Ohio and the United States.

26. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because at least one defendant transacts business within this district and committed acts proscribed by the False Claims Act within this district.

## III. THE FALSE CLAIMS ACT

27. The False Claims Act imposes liability upon any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . ." 31 U.S.C. § 3729(a)(1)(A).

28. The False Claims Act also imposes liability upon any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false

or fraudulent claim . . . ." 31 U.S.C. § 3729(a)(1)(B).

29. The False Claims Act defines "knowingly" to "mean that a person, with respect to information-(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

30. Under the False Claims Act, the term "claim":

> (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—
>
> (i) is presented to an officer, employee, or agent of the United States; or
>
> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
>
> (I) provides or has provided any portion of the money or property requested or demanded; or
>
> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and
>
> (B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property.

31 U.S.C. § 3729(b)(2).

31. There has been no prior "public[] disclos[ure]," as that term is used in the False Claims Act, 31 U.S.C. § 3730(e)(4)(A), of the allegations or transactions on which this action is based.

32. Even if a public disclosure has occurred, Relators are an "original source"

pursuant to 31 U.S.C. § 3730(e)(4)(B). Relators voluntarily disclosed to the Government the information on which the allegations or transactions involved in this litigation are based prior to any public disclosure. Additionally, Relators have knowledge that is independent of any such public disclosure and materially adds to any publicly disclosed allegations or transactions, and Relators voluntarily provided this information to the United States before filing this action.

33. Specifically, prior to filing this Complaint, Relators provided the United States Attorney for the Southern District of Ohio and the Plaintiff States a written Disclosure Statement of substantially all the material evidence and information in their possession related to the allegations in this Complaint in accord with 31 U.S.C. § 3730(b)(2). The Disclosure Statement includes the work product of Relators' attorneys and was submitted to the attorneys for the United States and the Plaintiff States. Therefore, the Disclosure Statement is confidential and privileged pursuant to the joint prosecution and common interest privileges.

34. Defendants are aware of the False Claims Act. In 2010, one of the wholly-owned subsidiaries of Defendant Remedi SeniorCare Holding Corporation, Defendant Remedi SeniorCare of Maryland, LLC (f/k/a Woodhaven Pharmacy Services, LLC), settled a *qui tam* False Claims Act complaint with the United States. The suit alleged that this Defendant and Remedi subsidiary submitted false claims for payment by billing GHPs twice for the same medication.

## IV. PARTIES

35. Relator Maureen Gearhart, PharmD is a resident of Waynesville, Ohio. She is a pharmacist licensed in Ohio, Colorado, Texas, and Oklahoma. From April 2000 until June 2020, she worked for Remedi SeniorCare in Troy, Ohio. She began at Remedi as a

consultant pharmacist, responsible for patient medication review and formulary management for the residential living facilities who contract with Remedi to provide pharmaceutical services.

36. In June 2015, Remedi promoted Relator Gearhart to the position of Director and then subsequently to Vice President of the Clinical Services Center. As a result, Relator Gearhart managed a centralized department in Troy, Ohio that was responsible for processing medication prior authorizations[1] for GHPs and other payors for all Remedi pharmacies nationwide. She became knowledgeable about certain of Remedi's company-wide prescription management and billing practices.

37. On December 17, 2019, the United States' Complaint-in-Intervention in *United States ex rel. Bassan v. Omnicare, Inc.*, No 1:15-cv-04179-CM (S.D. N.Y.) was unsealed and publicized. This Complaint alleged that Remedi's competitor, Omnicare, Inc., violated the False Claims Act by submitting false claims for payment for prescription drugs that were expired or whose prescriber authorized refills were exhausted. Just a few days after the Government's complaint against Omnicare was unsealed, Remedi SeniorCare's CEO Jeffrey Stamps asked Relator Gearhart to join a team that would work on a plan to transition Remedi away from filling expired and unauthorized prescriptions and billing them to Government payors.

38. Relator Laura Griffieth is a resident of Troy, Ohio. From May 2011 to July 2012, she worked in Remedi's Order Entry Department at its Troy, Ohio pharmacy, where she was responsible for entering into Remedi's computer system the prescriptions

[1] Prior authorizations are short applications that sometimes must be submitted to payors to obtain the right to claim payment for certain medications when they are prescribed.

of patients living in assisted living facilities and other adult residential facilities. After working at a retail pharmacy from 2012 to 2015, she returned to Remedi in 2015 as a Lead Clinical Pharmacy Technician, which is a supervisory "Team Leader" position in Remedi's Clinical Services Center in Troy.

39. In 2017, Relator Griffieth was promoted to Clinical Supervisor, where she is responsible for managing technicians in the Clinical Services Center who prepare prior authorizations for pharmacists to review. During her tenure at Remedi, she has observed Remedi's prior practice of generally dispensing prescriptions under valid prescriptions as well as its current company-wide practice of filling and billing for drugs with expired or otherwise invalid prescriptions.

40. Defendant Remedi SeniorCare Holding Corporation is a Maryland corporation established on May 7, 2003 doing business in the State of Ohio. Remedi SeniorCare Holding Corporation is the sole controlling member of each of the subsidiaries named as a Defendant and identified below. Among other activities, Remedi SeniorCare Holding Corporation operates a website by which it solicits new customers in the State of Ohio, recruits employees in the state of Ohio, and allows Ohio customers to log in and pay their bills. CSC-Lawyers Incorporating Service Company, located at 7 St. Paul Street, Suite 820, Baltimore, MD, 21202, is the registered agent for this company. Remedi SeniorCare Holding Corporation owns and operates pharmacies in states including Colorado, Florida, Texas, Maryland, Michigan, Ohio, Oklahoma, and Florida.

41. Jeffrey Stamps is the Chief Executive Officer of Defendant Remedi SeniorCare Holding Corporation. He is a pharmacist who previously worked at Omnicare Inc. from 1990 until 2012, where he served as the Executive Vice President and President of Long-

Term Care Operations. Because Mr. Stamps resides in Ohio, he frequently visits and works from the office of Remedi SeniorCare Holding Corporation's wholly owned subsidiary, Remedi SeniorCare of Ohio, LLC at 962 Dorset Road, Troy, Ohio 45373.

42. Mr. Stamps and other executives and agents of Remedi SeniorCare Holding Corporation (including Executive Vice President and Chief Operating Officer, Mark Schroder, R.Ph.; Chief Clinical Officer and Corporate Compliance Officer, Jennifer Hardesty, PharmD; Chief Financial Officer, John Gould; and Chief Legal Officer Kathleen Chagnon) conduct business in the state of Ohio on behalf of this Defendant in person, by email, and/or by telephone. The business conducted in Ohio by these executives and agents on behalf of Remedi SeniorCare Holding Corporation includes business relating to the truthfulness of claims for payment submitted for prescriptions filled for Ohio patients and decisions affecting the employment status of Remedi SeniorCare of Ohio, LLC's Ohio-based employees. Some examples of the business conducted in Ohio are discussed in this Complaint.

43. Defendant Remedi Healthcare Services, LLC is a Maryland limited liability company established on July 16, 2018 registered and doing business in the State of Ohio. Corporation Service Company, located at 50 West Broad Street, Suite 1330, Columbus, Ohio, 43215, is the Ohio registered agent for this company. The sole member of Defendant Remedi Healthcare Services, LLC is Defendant Remedi SeniorCare Holding Corporation.

44. Defendant Remedi SeniorCare of Ohio, LLC (f/k/a Remedi Healthcare) is a Maryland limited liability company established on April 4, 2008. Its pharmacy operations are performed at its office at 962 S. Dorset Road, Troy, Ohio, 45373 and as such this company does business in Ohio. Corporation Service Company, located at 50

West Broad Street, Suite 1330, Columbus, Ohio, 43215 is the Ohio registered agent for this company. The sole member of Defendant Remedi SeniorCare of Ohio-Northeast LLC is Defendant Remedi SeniorCare Holding Corporation.

45. Defendant Remedi SeniorCare of Ohio-Northeast, LLC (f/k/a Remedi SeniorCare of Florida, LLC) is a Maryland limited liability company established on August 15, 2011 doing business in the State of Ohio. Its pharmacy operations are performed at its office at 26251 Bluestone Boulevard, #1, Euclid, Ohio, 44132. All prior authorizations needed for certain prescription medication dispensed by this pharmacy are processed at Remedi's Clinical Services Center located in Troy, Ohio, and as such, this company does business in Ohio. Corporation Service Company, located at 50 West Broad Street, Suite 1330, Columbus, Ohio, 43215 is the registered agent for this company. The sole member of Defendant Remedi SeniorCare of Ohio-Northeast LLC is Defendant Remedi SeniorCare Holding Corporation.

46. Defendant Remedi SeniorCare of Colorado, LLC is a Maryland limited liability company established on December 30, 2016. All prior authorizations needed for certain prescription medication dispensed by this pharmacy are processed at Remedi's Clinical Services Center located in Troy, Ohio, and, as such, this company does business in Ohio. Its other pharmacy operations are performed at its office at 8971 N. Harlan Street, Westminster, Colorado, 80031. CSC-Lawyers Incorporating Service Company, located at 7 St. Paul Street, Suite 820, Baltimore, MD, 21202, is the registered agent for this company. The sole member of Defendant Remedi SeniorCare of Colorado, LLC is Defendant Remedi SeniorCare Holding Corporation.

47. Defendant Remedi SeniorCare of Dallas, LLC is a Maryland limited liability established on October 9, 2015. All prior authorizations needed for certain prescription

medication dispensed by this pharmacy are processed at Remedi's Clinical Services Center located in Troy, Ohio, and as such, this company does business in Ohio. Its other pharmacy operations are performed at its office at 2700 Research Drive, Plano, Texas, 75074. CSC-Lawyers Incorporating Service Company, located at 7 St. Paul Street, Suite 820, Baltimore, MD, 21202, is the registered agent for this company. The sole member of Defendant Remedi SeniorCare of Dallas, LLC is Defendant Remedi SeniorCare Holding Corporation.

48. Defendant Remedi SeniorCare of Houston, LLC is a Maryland limited liability company established on July 5, 2018. All prior authorizations needed for certain prescription medication dispensed by this pharmacy are processed at Remedi's Clinical Services Center located in Troy, Ohio, and as such, this company does business in Ohio. Its other pharmacy operations are performed at its office at 16601 Central Green Boulevard, Houston, Texas, 77032. CSC-Lawyers Incorporating Service Company, located at 7 St. Paul Street, Suite 820, Baltimore, MD, 21202, is the registered agent for this company. The sole member of Defendant Remedi SeniorCare of Houston, LLC is Defendant Remedi SeniorCare Holding Corporation.

49. Defendant Remedi SeniorCare of Maryland, LLC (f/k/a Woodhaven Pharmacy Services, LLC) is a Maryland limited liability company established on March 6, 2002. All prior authorizations needed for certain prescription medication dispensed by this pharmacy are processed at Remedi's Clinical Services Center located in Troy, Ohio, and as such, this company does business in Ohio. Its other pharmacy operations are performed at 9006 Yellow Brick Rd. Ste F, Baltimore, Maryland 21237. CSC-Lawyers Incorporating Service Company, located at 7 St. Paul Street, Suite 820, Baltimore, MD, 21202, is the registered agent for this company. The sole member of Defendant Remedi

SeniorCare of Houston, LLC is Defendant Remedi SeniorCare Holding Corporation.

50. Defendant Remedi SeniorCare of Michigan, LLC is a Maryland limited liability company established on September 13, 2017. All prior authorizations needed for certain prescription medication dispensed by this pharmacy are processed at Remedi's Clinical Services Center located in Troy, Ohio, and, as such, this company does business in Ohio. Its other pharmacy operations are performed at its office at 14700 Helm Court, Plymouth, Michigan, 48170. Corporation Service Company, located at 50 West Broad Street, Suite 1330, Columbus, Ohio, 43215 is the registered agent for this company. The sole member of Defendant Remedi SeniorCare of Michigan, LLC is Defendant Remedi SeniorCare Holding Corporation.

51. Defendant Remedi SeniorCare of Oklahoma, LLC is a Maryland limited liability company established on October 30, 2015. All prior authorizations needed for certain prescription medication dispensed by this pharmacy are processed at Remedi's Clinical Services Center located in Troy, Ohio, and, as such, this company does business in Ohio. Its other pharmacy operations are performed at its office at 4243 Will Rogers Parkway, Oklahoma City, Oklahoma, 73108. CSC-Lawyers Incorporating Service Company, located at 7 St. Paul Street, Suite 820, Baltimore, MD, 21202, is the registered agent for this company. The sole member of Defendant Remedi SeniorCare of Oklahoma, LLC is Defendant Remedi SeniorCare Holding Corporation.

52. Defendant Remedi SeniorCare of Pennsylvania, LLC (f/k/a Remedi SeniorCare of Michigan, LLC) is a Maryland limited liability company established on February 22, 2012. This company previously operated a pharmacy located in the state of Pennsylvania. All prior authorizations needed for certain prescription medication that was dispensed by this pharmacy were processed at Remedi's Clinical Services Center

located in Troy, Ohio, and, as such, this company did business in Ohio. Its other pharmacy operations were performed at its office at 121 Green Tree Road, Suite 110, Phoenixville, Pennsylvania, 19460. CSC-Lawyers Incorporating Service Company, located at 7 St. Paul Street, Suite 820, Baltimore, MD, 21202, is the registered agent for this company. The sole member of Defendant Remedi SeniorCare of Pennsylvania, LLC is Defendant Remedi SeniorCare Holding Corporation.

53. Defendant Remedi SeniorCare of Tampa, LLC is a Maryland limited liability company established on May 24, 2017. All prior authorizations needed for certain prescription medication dispensed by this pharmacy are processed at Remedi's Clinical Services Center located in Troy, Ohio, and, as such, this company does business in Ohio. Its other pharmacy operations are performed at its office at 6463 S. Falkenburg Road, Riverview, Florida, 33578. Corporation Service Company, located at 50 West Broad Street, Suite 1330, Columbus, Ohio, 43215 is the registered agent for this company. The sole member of Defendant Remedi SeniorCare of Tampa, LLC is Defendant Remedi SeniorCare Holding Corporation.

54. Defendant Remedi SeniorCare of Virginia, LLC is a Maryland limited liability company established on January 26, 2009. All prior authorizations needed for certain prescription medication dispensed by this pharmacy are processed at Remedi's Clinical Services Center located in Troy, Ohio, and, as such, this company does business in Ohio. Its other pharmacy operations are performed at its office at 10448 Lakeridge Parkway, Ashland, Virginia, 23005. CSC-Lawyers Incorporating Service Company, located at 7 St. Paul Street, Suite 820, Baltimore, MD, 21202, is the registered agent for this company. The sole member of Defendant Remedi SeniorCare of Virginia, LLC is Defendant Remedi SeniorCare Holding Corporation.

55. Remedi SeniorCare Holding Corporation and its Defendant subsidiaries acting collectively as a unified entity under the central control of Defendant Remedi SeniorCare Holding Corporation are referred to as "Remedi SeniorCare" or "Remedi" in this Complaint.

## V. GOVERNMENT HEALTHCARE PROGRAMS

56. Federal and state government healthcare programs (sometimes referred to as "**GHPs**"), including Medicare, Medicaid, and TRICARE, offer pharmaceutical benefits to their respective beneficiaries. These programs do not buy drugs directly; instead, they reimburse providers who dispense covered drugs to program beneficiaries.

57. Remedi's scheme to charge these state and federal GHPs for drugs dispensed with expired or otherwise invalid prescriptions is representative as to Remedi's conduct as to all GHPs.

58. For this reason, examples of Remedi carrying out its scheme against particular GHPs and in particular States are representative of Remedi's overall conduct as to other GHPs and other States.

### A. Medicare Part D

59. Medicare Part D is a voluntary prescription drug benefit program. 42 U.S.C. § 1395w–101(a). Individuals entitled to benefits under Medicare Part A or who are enrolled in Medicare Part B are eligible to obtain qualified prescription drug coverage through the Part D program by enrolling in a prescription drug plan. 42 U.S.C. § 1395w–101(a)(1); (a)(3)(A); 42 C.F.R. § 423.30(a).

60. Medicare Part D is primarily funded by the Medicare Prescription Drug Account, which is part of the Federal Supplementary Medical Insurance Trust Fund. 42 U.S.C. § 1395w–116(a)(1), (b). This Account is funded by the Treasury. 42 U.S.C.

§ 1395w–116(c)(3). Other funding comes from beneficiaries' annual deductible, coinsurance amounts, premiums, and any amounts beneficiaries must pay while in the coverage gap (a.k.a. donut hole). *See* 42 U.S.C. § 1395w–102(b)(1)(A), (b)(2), (b)(3), (b)(4)(C)(i); 42 U.S.C. § 1395w–116, 42 C.F.R. § 423.104(d).

61. Medicare Part D drug coverage is administered by Part D Plan Sponsors, which are entities licensed to provide health insurance. *See* 42 U.S.C. § 1395w–112. Plan Sponsors can be Medicare Advantage or other organizations offering qualified prescription drug coverage. 42 C.F.R. § 423.4 (definitions of "Part D plan sponsor" and "PDP sponsor").

62. The Medicare Part D program generally covers drugs that may only be dispensed under a prescription, biological products, insulin, and vaccines. 42 U.S.C. § 1395w–102(e); 42 C.F.R. § 423.100 (definitions of "Part D drug").

63. Plan Sponsors create a pharmaceutical formulary of covered drugs. *See* 42 C.F.R. § 423.120(b).

64. Plan Sponsors contract with state licensed pharmacies to provide covered Part D drugs to Medicare Part D beneficiaries who have enrolled in their plans. *See* 42 C.F.R. § 423.100 (definition of "network pharmacy").

65. When a pharmacy dispenses drugs to a Medicare Part D beneficiary, the pharmacy typically submits an electronic claim to the Plan Sponsor and then receives reimbursement and a remittance from the Plan Sponsor for the amount not paid by the beneficiary. *See* 42 U.S.C. § 1395w–112(b)(4)(D)(iii), (b)(4)(E).

66. Usually these transactions are processed by a contractual intermediary between the Plan Sponsor and the pharmacy, called a Pharmacy Benefit Manager ("**PBM**").

67. On the following page is a summary graphic illustrating some pertinent aspects of the relationship between Medicare, Plan Sponsors and PBMs, and pharmacies. The underlying facts will be alleged in more detail following this graphic.


Medicare Part D Program (HHS & CMS)
PBM or Plan Sponsor Submits Summary Record to Medicare Part D
The summary record (Prescription Drug Event or PDE) reports data from the pharmacy's claim such as the quantity dispensed and how many times the prescription has been filled. The PDE must accurately state this data and can only be submitted when there is a valid prescription because:
- PBMs and Plan Sponsors must agree to follow regulations, including those requiring that claims for payment must be for drugs dispensed on valid prescriptions. 42 C.F.R. §§ 423.100 ("valid prescription"), 423.104(h) (2012); 42 C.F.R. § 423.505(i)(3)(iii), (i)(3)(v), (i)(4)(iv) (2010); 42 U.S.C. § 1395w-112(b)(1).
- Plan Sponsor & PBMs must certify the accuracy, completeness and truthfulness of the claims data. 42 C.F.R. § 423.505(k)(1), (k)(3) (2010).
Medicare Part D Pays PBMs or Plan Sponsors for Administering & Providing Prescription Drug Benefit
Plan Sponsor / Pharmacy Benefit Manager (PBM)
(PBM usually administers pharmacy benefit on behalf of Plan Sponsor)
Pharmacy Submits Electronic Claim for Payment to PBM or Plan Sponsor
Claim reports data such as when the prescription was written, quantity dispensed, refills authorized, and how many times the prescription has been filled. The claim must accurately state this data and can only be submitted for drugs dispensed upon valid prescriptions because:
- Pharmacies are required to follow regulations, including those requiring that prescription drugs are only covered if dispensed upon a valid prescription. 42 C.F.R. §§ 423.100 ("valid prescription"), 423.104(h) (2012); 42 C.F.R. § 423.505(i)(3)(iii), (i)(3)(v) (2010).
- Pharmacies must certify the accuracy, completeness and truthfulness of electronic claims data. 42 C.F.R. § 423.505(k)(3) (2010).
PBM or Plan Sponsor Pays Pharmacies with Government Funds for Dispensing Prescription Medication
Pharmacy

68. The electronic billing claims for reimbursement that pharmacies submit to the PBM or Plan Sponsor typically are required to include information about the Medicare beneficiary and prescription prescriber, the date the prescription was written, how the prescription was transmitted to the pharmacy (such as paper copy, electronically, facsimile, or by phone), the quantity of the medication dispensed, the number of refills authorized by the prescriber on the prescription, the prescription number, the fill number (which distinguishes between original and subsequent refills of the same medicine), and the amount claimed for reimbursement.

69. Plan Sponsors must submit data at the individual level regarding drug claims to the Centers for Medicare & Medicaid Services ("**CMS**"). 42 C.F.R. § 423.329(b)(3); 42 U.S.C. § 1395w–115(c)(1)(C).

70. Payment to plan sponsors is conditioned on supplying this data. 42 C.F.R. § 423.322(a); *see also* CMS, Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE), p. 9, Sec. 1.4 (April 27, 2006).

71. To satisfy the requirement of providing this data, plan sponsors submit a summary record called the prescription drug event ("**PDE**") to CMS. CMS, Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE), p. 6 (April 27, 2006).

72. The PDE record includes data elements about the drug dispensed from the pharmacy's claim, such as the quantity dispensed, the days' supply dispensed, the prescription number, and the fill number, which "distinguishes original versus subsequent refills of the same prescription from the same pharmacy." The PDE also includes other information about the prescription and Medicare beneficiary, and how much the pharmacy was paid. CMS, Updated Instructions: Requirements for Submitting

Prescription Drug Event Data (PDE), 11–18 (April 27, 2006); *see also* 73 Fed. Register 30663, 30667, 30684–85 (May 28, 2008).

73. Each PDE submitted to CMS is a summary record that documents the final adjudication of a dispensing event based upon claims received from the pharmacies. *See* CMS, Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE), p. 9 (April 27, 2006).

74. Information submitted in the PDE affects payments by CMS to Plan Sponsors. *See id.* at p. 5; 42 C.F.R. §§ 423.322(a), 423.329(b)(3), 423.315; 42 U.S.C. § 1395w–115(c)(1)(C).

75. Throughout the year, CMS makes monthly prospective payments to plan sponsors for several subsidies: (1) based on the plan sponsors' bids, a direct subsidy designed to cover the sponsors' costs of providing the benefits; (2) estimated low-income cost-sharing subsidy; and (3) estimated reinsurance subsidy. *See* 42 C.F.R. § 423.315(a)–(d); 42 C.F.R. § 423.265(c), (c)(1).

76. CMS provides advance monthly payments to plan sponsors. These payments are based on the sponsors' bids. 42 C.F.R. § 423.315(b), 42 C.F.R. § 423.329(a).

77. CMS uses PDE data to reconcile these monthly-payments made to plan sponsors with actual program cost data. *See* 42 C.F.R. § 423.315(b); 42 C.F.R. § 423.329(a), (b), (b)(3).

78. After the close of the plan year, CMS uses the reconciled data in calculating final payments owed to the plan sponsor, including low income subsidies and reinsurance subsidies. See 42 C.F.R. § 423.315; 42 C.F.R. § 423.329(c)(2)(ii), 42 C.F.R. § 423.343; CMS, Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE), pp. 5–6 (April 27, 2006)

79. CMS will also calculate and issue a lump-sum payment or adjust monthly payments based on a Part D plan's allowable risk corridor costs. 42 C.F.R. § 423.315(e); 42 C.F.R. § 423.336.

80. Plan sponsors who fail to submit accurate claims-level information contained in the PDEs to CMS risk having to return monthly payments to CMS during reconciliation or having future payments adjusted or ceased. *See* 42 C.F.R. § 423.322(a); CMS, Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE), p. 10, Sec. 1.4.2 (April 27, 2006).

81. As contractors or subcontractors to the plan sponsors, pharmacies must "certify (based on best knowledge, information, and belief) the accuracy, completeness and truthfulness of the [claims] data" and must "acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k)(3) (2010).

82. The Plan Sponsor similarly certifies the accuracy, completeness, and truthfulness of the claims data and other data related to payment accuracy as a condition of receiving payment from the Government. 42 C.F.R. § 423.505(k)(1), (k)(3) (2010).

83. The section of the Part D regulations setting out the certifications for these requirements is entitled "Certification of data that determine payment." 42 C.F.R. § 423.505(k) (2010). Thus, the certifications related to the accuracy of the payment are an express condition of payment under the Medicare Part D program.

84. A Plan Sponsor is not eligible for payments unless it has contracted with the Secretary of the U.S. Department of Health and Human Services ("**HHS**") and agreed to the applicable requirements and standards, as well as the terms and conditions of

payment of the Part D program. 42 U.S.C. § 1395w–112(b)(1).

85. CMS requires that this obligation apply to pharmacies and PBMs as well. 42 C.F.R. § 423.505(i)(3)(iii) (2010). Pharmacies and PBMs must likewise contractually agree to "comply with all applicable Federal laws, regulations, and CMS instructions." 42 C.F.R. § 423.505(i)(3)(v), (i)(4)(iv) (2010).

86. Under CMS regulations: "**A Part D sponsor may only provide benefits for Part D drugs that require a prescription if those drugs are dispensed upon a valid prescription**." 42 C.F.R. § 423.104(h) (April 12, 2012) (emphasis added). This is a requirement for prescription drug coverage. **A "[v]alid prescription means a prescription that complies with all applicable State law requirements constituting a valid prescription."** 42 C.F.R. § 423.100 (April 12, 2012) (definition of "valid prescription") (emphasis added).

87. **CMS regulations further specify that Part D plans are only permitted to cover drugs that "may be dispensed only upon a prescription."** 42 C.F.R. § 423.104(c) (2010); 42 C.F.R. § 423.100 ("qualified prescription drug coverage," "standard prescription drug coverage," "alternative prescription drug coverage," and "Part D drug") (2010).

88. Pharmacies, PBMs, and Plan Sponsors must all maintain documents relating to their activities—including documents showing entitlement to payment—and must produce them to CMS upon request. 42 C.F.R. § 423.505 (b)(8)–(10), (d), (e), (f)(3), (i)(3)(iii)–(iv) (2010).

89. These record-keeping requirements include a requirement of maintaining prescription drug claims for ten years as well as records needed to evaluate the appropriateness of those claims. 42 C.F.R. § 423.505(d)(2)(ii), (d)(2)(xi), (i)(3)(iv)

(2010).

90. The certifications made by Plan Sponsors (and their downstream PBMs and pharmacies) must be made annually by the Plan Sponsor's CEO, the CFO, or their authorized delegate, who must sign an "Attestation of Data Relating to CMS Payment to Medicare Part D Sponsor" among other attestations.

91. Submitting or causing the submission of false claims for drugs dispensed under invalid prescriptions for Part D funds also results in several types of false claims and statements, as listed in the following paragraphs.

92. First, the pharmacy's claim for reimbursement is a false claim for payment because it is seeking payment for dispensing a prescription drug that is ineligible for payment.

93. Second, such pharmacy claims for payment (as well as any resulting PDEs) are also false because CMS requires pharmacies to agree to only submit claims that comply with all applicable laws, regulations and instructions, but claims for medication that are expired or otherwise lack a valid prescription do not so comply.

94. Third, claims for expired or otherwise invalid prescriptions also contain express false statements concerning the prescription number, date the prescription was written, the fill number, and refills authorized.

95. Fourth, filling such expired or otherwise invalid prescriptions also can result in false statements on the PDEs regarding the fill number of the prescription.

96. Fifth, a pharmacy's submission of false claims for payment causes false annual certifications by the pharmacies, PBMs, and Plan Sponsors.

97. Remedi's decision to submit or cause the submission of false claims for payment for prescriptions that are expired or were otherwise dispensed without a valid

prescription despite laws, regulations, and contractual requirements limiting reimbursement to drugs dispensed pursuant to valid prescriptions is a knowing, material violation of the False Claims Act.

### B. Federal & State Funded Medicaid Program

98. The Medicaid program was established in 1965 pursuant to 42 U.S.C. § 1396, *et seq*. Medicaid is a voluntary program jointly financed by the federal government and by the states.

99. Through the Medicaid program, the Federal Government provides funds to the states to provide medical assistance to individuals, including children and "aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1. Funds for Medicaid are appropriated from the Treasury and are provided to the States. 42 U.S.C. §§ 1396-1, 1396b.

100. Though mostly funded by the Federal Government, Medicaid programs are administered by the individual states. *See* 42 U.S.C. § 1396a.

101. The Federal government pays a share of the medical assistance expenditures under each state's Medicaid program. That share, known as the Federal Medical Assistance Percentage ("**FMAP**") or the Federal Financial Participation, is determined annually by a formula that compares the State's average per capita income level with the national income average.

102. States with a low per capita income level are reimbursed at a higher percentage share of their costs than states with a high per capita income level. By law, the FMAP cannot be lower than 50 percent or higher than 83 percent.

103. Many states contract with private companies to evaluate and process claims.

No matter how each state manages its Medicaid program, the federal government reimburses it on a quarterly basis for the federal government's FMAP sharing percentage of the money actually spent by the state. *See* 42 U.S.C. § 1396d(b); 42 C.F.R. § 430.30.

104. Each state establishes its own Medicaid program and, within federal guidelines, determines the amount, duration, and scope of services covered. States must cover certain mandatory benefits and may choose to provide other optional benefits, like pharmacy coverage.

105. According to CMS, "all states currently provide coverage for outpatient prescription drugs to all categorically eligible individuals and most other enrollees within their state Medicaid programs." CMS, Medicaid.gov, *Prescription Drugs*, available at https://www.medicaid.gov/medicaid/prescription-drugs/index.html (last accessed September 28, 2020).

106. Medicaid only covers prescribed drugs and does not cover drugs dispensed without valid prescriptions. *See* 42 U.S.C. § 1396d(a), (a)(12) (medical assistance that the federal and state government provide means "payment of part or all the cost of the following care and services," including for . . . "prescribed drugs").

107. When pharmacies dispense medications to Medicaid beneficiaries, they submit claims for payment to the state's Medicaid program, usually through a PBM. These claims must include basic information about the claim and the authorizing prescription, typically including information about the Medicaid beneficiary and prescriber, the date the prescription was written, how the prescription was transmitted to the pharmacy (such as paper copy, electronically, facsimile, or by phone), the quantity of the medication dispensed, the number of refills authorized by the prescriber, the fill

number (which distinguishes between original and subsequent refills of the same medicine), and the amount claimed for reimbursement.

108. In submitting claims for payment, all Medicaid providers must certify that the information supplied on their claims is "true, accurate, and complete," acknowledge that "payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws." 42 C.F.R. § 455.18.

109. The representations made by providers in claim forms submitted for Medicaid funds influence or are capable of influencing the States' decision to pay Medicaid funds for the claims submitted.

110. CMS also requires that states enter into provider agreements with each provider that furnishes services to Medicaid beneficiaries, including pharmacies. 42 C.F.R. § 431.107. These agreements vary by State. However, all States at issue in this Complaint—either by required provider agreement or by law, regulation, or program rules—require that providers maintain records necessary to disclose the extent of the services furnished to state beneficiaries and require that the providers comply with applicable laws, regulations, and/or rules.

111. The representations made by providers and suppliers on provider agreements and/or claim forms influence or are capable of influencing the Medicaid programs' decisions to pay Medicaid funds for the claims submitted.

112. In many states, Medicaid beneficiaries receive their Medicaid benefits through managed care plans.

113. These managed care plans are authorized to provide or arrange for the providing of health care services to Medicaid beneficiaries, including prescription drug

coverage. *E.g.*, Ohio Rev. Code. Ann. § 5167.10.

114. Since these plans are also federally funded, claims to them are also claims within the scope of the False Claims Act. 31 U.S.C. § 3729(b)(2).

115. Submitting or causing the submission of false claims for expired or otherwise invalid prescriptions for Medicaid funds also results in several types of false claims and statements, as listed in the following four paragraphs.

116. First, the pharmacy's claim for reimbursement is a false claim for payment because it seeks payment for dispensing a prescription drug that is ineligible for payment.

117. Second, such claims are also false because pharmacies may only submit claims to Medicaid that comply with applicable laws, but claims for medication that are expired or otherwise lack a valid prescription do not so comply.

118. Third, claims for payment for expired or otherwise invalid prescriptions contain express false statements concerning the date the prescription was written, the fill number, and refills authorized.

119. Fourth, due to such false statements on the claims, certifications by the pharmacies submitting the claims for payment that the claims are true, accurate, and complete are also false.

120. Remedi's decision to submit or cause the submission of false claims for payment for prescriptions dispensed without a valid prescription despite laws, regulations, and contractual requirements clearly limiting reimbursement to drugs dispensed pursuant to valid prescriptions is a knowing, material violation of the federal False Claims Act and, as applicable, the False Claims Acts of the Plaintiff States.

### C. TRICARE

121. TRICARE is a health care program established by the Department of Defense for active duty service members and their families, retired service members and their families, and certain other eligible beneficiaries. *See* 32 C.F.R. § 199.17. TRICARE was formerly known as CHAMPUS.

122. TRICARE was managed by the TRICARE Management Activity until October 1, 2013, when responsibility for TRICARE was transferred to the newly created Defense Health Agency.

123. TRICARE provides direct care to beneficiaries at military hospitals and clinics and, as relevant to this case, TRICARE offers its beneficiaries health care coverage through health plans which cover services and care provided by civilian healthcare entities, including pharmacies.

124. TRICARE pays for "prescribed medical care obtained from civilian sources" including "prescription drugs." *See* 32 C.F.R. § 199.4(a), (a)(1)(i).

125. Prescription drugs that lack a valid prescription have not been "prescribed," and so TRICARE will not make payment for such claims.

126. TRICARE uses the PBM Express Scripts to administer its pharmacy benefits.

127. TRICARE has created a formulary of covered drugs. 32 C.F.R. § 199.21(a)(2), (a)(3). Its beneficiaries can obtain these covered drugs at sources including retail pharmacies who join TRICARE's retail network. 32 C.F.R. § 199.21(h)(1)(ii).

128. The Department of Defense pays for TRICARE covered pharmaceuticals at agreed formula prices. 32 C.F.R. § 199.21(q); 38 U.S.C. § 8126. TRICARE covers the entire cost of the pharmaceuticals dispensed by retail pharmacies for active duty services members. All other TRICARE beneficiaries pay a cost share. 32 C.F.R.

§ 199.21(i)(2).

129. When pharmacies dispense medications, they submit claims for payment to TRICARE's PBM, Express Scripts.

130. The claims must include basic information about the claim and the prescription, including information about the Medicaid beneficiary, the prescriber, the date the prescription was written, how the prescription was transmitted to the pharmacy (such as paper copy, electronically, facsimile, or by phone), the quantity of the medication dispensed, the number of refills authorized by the prescriber on the prescription, the number of times the prescription has been filled, and the amount claimed for reimbursement. Express Scripts NCPDP Version D.0 Payer Sheet, Department of Defense (Jan. 1, 2017).

131. When pharmacies submit electronic claims for payment for TRICARE funds, pharmacies attest to the same certifications as on the paper claim form CMS 1500. TRICARE Operations Manual 6010.59-M, ch. 8, Sec. 1, paragraph 3.1.3 (April 1, 2015).

132. The required certification on that form is as follows:

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate, and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions . . . 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment . . .
>
> NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal . . . funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or state laws.

133. Upon receiving the claim, Express Scripts electronically transmits the claim

data to TRICARE using a TRICARE Encounter Data record. *See* TRICARE Systems Manual 7950.3-M, Ch. 2, Sec. 1.1 (April 1, 2015); TRICARE Operations Manual 6010.59M, Ch. 23, Section 4, paragraph 3.7 (April 1, 2015); Health.mil, TRICARE Encounter Data (last accessed Nov. 10, 2020), available at https://www.health.mil/Military-Health-Topics/Technology/Claims-Processing/TRICARE-Encounter-Data.

134. If TRICARE authorizes payment of the claim, the PBM sends payment on behalf of TRICARE to the pharmacy. *See id.*

135. TRICARE providers are required to comply with program requirements. 32 C.F.R. §§ 199.6(a), 199.9(a)(4).

136. Such program requirements include the requirement that the scope of benefits only includes coverage of prescribed drugs. 32 CFR § 199.4(a), (a)(1)(i).

137. Such program requirements also include regulations specifying that examples of presumed fraud include submitting claims for noncovered services and "[m]isrepresentations of dates, frequency, duration, or description of services rendered, or of the identity of the recipient of the services or the individual who rendered the services." 32 C.F.R. § 199.9(c)(2), (c)(6).

138. TRICARE providers must also maintain adequate clinical records to substantiate that the specific care was appropriate. 32 C.F.R. § 199.6(a)(12).

139. Submitting or causing the submission of false claims for drugs dispensed under expired or otherwise invalid prescriptions for TRICARE funds also results in several types of false claims and statements, as listed in the following paragraphs.

140. First, the pharmacy's claim for reimbursement is a false claim because it seeks payment for dispensing a prescription drug that not eligible for payment when there is

no existing valid prescription. *See* 32 C.F.R. § 199.4(a), (a)(1)(i).

141. Second, claims that fail to disclose that no valid prescription exists do not comply with the required CMS 1500 certification because they the claims falsely certify that sufficient information to allow the government to make an informed payment decision has been provided or will be provided.

142. Third, pharmacies agree to comply with applicable laws, regulations, and program instructions and these claims did not so comply because the prescription medication was dispensed under an expired or otherwise invalid prescription.

143. Fourth, claims for payment based upon medication disbursed upon expired or otherwise invalid prescriptions contain express false statements concerning the date the prescription was written, the fill number, and refills authorized. *See* 32 C.F.R. § 199.9(c)(2), (c)(6).

144. Fifth, due to such false statements on the claims, certifications by the pharmacies submitting the claims that the claims for payment are true, accurate, and complete are also false.

## VI. VALID PRESCRIPTIONS UNDER STATE LAW

145. GHPs only pay for prescription drugs if they are prescribed and do not pay for drugs lacking valid prescriptions. *See* 42 C.F.R. § 423.104(h), 42 C.F.R. § 423.100 (definition of "valid prescription") (April 12, 2012); 42 C.F.R. § 423.104(c), 42 C.F.R. § 423.100 ("qualified prescription drug coverage," "standard prescription drug coverage," "alternative prescription drug coverage," and "Part D drug") (2010); 42 U.S.C. § 1396d(a)(12); and 32 C.F.R. § 199.4(a), (a)(1)(i). A "valid prescription" is "a prescription that complies with all applicable State law requirements constituting a valid prescription." 42 C.F.R. § 423.100 (April 12, 2012) (definition of "valid prescription").

146. State laws and regulations contain a number of important validity requirements. Most important to this case are the state laws and regulations that generally provide that prescriptions for non-controlled drugs are valid for a limited period, typically one year, and/or specify that refills may only be dispensed as authorized by the physician or other authorized prescriber. *See* paragraphs 154–58, below.

### A. Basic Prescription Requirements

147. State laws typically provide that prescription drugs can only be dispensed by a pharmacist pursuant to a valid order from a prescriber authorized to write prescriptions. *See, e.g.*, Ohio Admin. Code 4729-5-30(A); D.C. Mun. Regs. tit. 22, § B1325.1; Minn. Stat. § 151.01(16a) & Minn. R. 6800.0100 Subpart 11a.

148. Orders for prescription drugs can be made in writing, electronically, or by facsimile. *See, e.g.*, Ohio Admin. Code 4729-5-21(C)(1); S.C. Code Ann. § 40-43-86(E)(7), (F); Tenn. Comp. R. & Regs. 1140-03-.03(1); 1140-03-.04(1), (2).

149. Verbal prescriptions are typically acceptable as well, but most states require that the verbal orders be documented by the pharmacist or pharmacy technician. *See, e.g.*, Okla. Stat. Ann. tit. 59, § 353.20.1; W. Va. Code R. § 15-1-17.1.2.

150. Prescriptions typically must contain elements such as the patient's name; the prescriber's name; the drug being prescribed, the quantity of the drug to be dispensed, dosage or strength, directions for use, and the date the prescription was issued. *See, e.g.*, 225 Ill. Comp. Stat. Ann. 85/3(e); S.C. Code Ann. § 40-43-86(E); 22 Tex. Admin. Code

§ 291.34(b)(7) .[2]

151. When dispensed, prescriptions typically must also contain an identifying prescription number. *See, e.g.*, Fla. Stat. § 465.026(1)(d); Ga. Code Ann. § 26-4-80(k)(1); 225 Ill. Comp. Stat. Ann. 85/22(e).

152. Medicare uses much of this reported prescription information. The prescription number in combination with the fill number (which distinguishes between original and subsequent fills of the same prescription from the same pharmacy), along with the identity of the beneficiary, the pharmacy's service provider ID, the date of dispensing, and the dispensing status allow Medicare to uniquely identify a prescription. CMS, Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE), at 17–18, Sec. 3 (April 27, 2006), available at https://www.cms.gov/medicare/prescription-drug-coverage/drugcoverageclaimsdata/downloads/pdeguidance.pdf

153. Unless these applicable prescription requirements are satisfied for each given prescription, that prescription is not valid and cannot legally be filled.

### B. Prescription Validity Requirements for Refilling Drugs

154. In the states at issue in this Complaint, absent satisfaction of emergency requirements, prescriptions for residents of assisted living facilities (and other shared adult living facilities at which medical care is not provided daily) are not valid unless the time limits and authorizations listed in the following paragraphs have not been exceeded.

[2] Controlled substances have additional prescription requirements, but the allegations in this Complaint relating to billing for expired and otherwise invalid prescriptions are limited to noncontrolled substances.

155. By law, in the following States prescriptions cannot be refilled beyond a statutorily or regulatorily designated time period from the date the prescription was issued:

A. **Colorado** (one year) (Colo. Code Regs. § 3.00.10; *see also* Colo. Rev. Stat § 12-280-123(1));

B. **District of Columbia** (one year) (D.C. Mun. Regs. tit. 22 § B1325.8; D.C. Mun. Regs. tit. 22 § B1325.9);

C. **Florida** (one year) (Fla. Admin. Code Ann. r. 64B16-27.211);

D. **Illinois** (15 months) (225 Ill. Comp. Stat. Ann. 85/3(e));

E. **Michigan** (one year) (Mich. Admin. Code r. 338.479b(4));

F. **Missouri** (one year) (Mo. Code Regs. Ann. tit. 20 § 2220-2.110(1)); and

G. **South Carolina** (two years) (S.C. Code Ann. § 40-43-86(E)(6)).

156. In these States, prescriptions cannot be refilled more than one year from the date the prescription was issued **and** all refills must be authorized by a prescriber:

A. **Alaska** (Alaska Admin. Code tit. 12, § 52.470(a), (b)) (effective until April 3, 2020); *see also* Alaska Admin. Code tit. 12, § 52.470(d)) (effective until April 3, 2020) and Alaska Admin. Code tit. 12, § 52.470(d), (g), and (i) (effective as of April 3, 2020);

B. **Delaware** (24 Del. Admin. Code § 2500-5.1.9);

C. **Louisiana** (La. Admin. Code tit. 46, Part LIII, §2525; La. Rev. Stat. Ann. §37: 1224.1.);

D. **Minnesota** (Minn. R. 6800.3510; Minn. Stat. § 151.211);

E. **New Hampshire** (N.H. Code Admin. R. Ph 704.14(a));

F. **Ohio** (Ohio Admin. Code 4729-5-30(B)(8), (B)(11));

G. **Oklahoma** (Okla. Admin. Code §§ 535:15-3-11(a), (b));

H. **Oregon** (OAR 855-041-1105(1), OAR 855-041-1125(1));

I. **Pennsylvania** (49 PA. Code § 27.18(i));

J. **Rhode Island** (216-40-15-1 R.I. Code R. §§ 1.4.21(E)(6), 1.4.22(A));

K. **Tennessee** (Tenn. Comp. R. & Regs. 1140-03-.03(6)(b), (6)(d));

L. **Texas** (22 Tex. Admin. Code § 291.34(b)(8)(A) & (B); 22 Tex. Admin. Code § 291.104(a)(15));

M. **West Virginia** (W. Va. Code R. § 15-1-7.1 & 7.3; W.Va. Code § 30-5-26); and

N. **Wisconsin** (Wis. Admin. Code Phar. Examining Board § Phar. 7.03, 7.01(1)(f)).

157. States that require that prescriptions be dispensed as authorized or dictated by a prescriber:

A. **Georgia** (Ga. Code Ann. § 26-4-80(e)) (refills only as authorized by the prescriber);

B. **Maryland** (*See* MD. Code Ann. Health Occ. § 12-506(a) (refills only as authorized by the prescriber unless emergency procedures are followed); *see also* MD. Code Ann. Health Occ. § 12-512(c), (d)); and

158. Some states allow prescribers to write prescriptions on the medical charts of patients living in assisted living facilities, with the following restrictions:

A. **Arizona:** Prescriptions cannot be refilled more than one year from the date the prescription was issued and state law requires that all refills must be authorized by a prescriber. A.R.S. § 32-1968(A)(6), (B). For residents of assisted living facilities, a pharmacy may dispense a prescription when it receives an order from an authorized prescriber or an assisted living facility manager or caregiver acting under the authority of a licensed medical practitioner (A.A.C. § R4-23-703(D)(1)(c)), but only if the prescription order provides the required instructions, including stating the drug name, quantity prescribed, and quantity dispensed (A.A.C. § R4-23-703(D)(2)(a), A.A.C. § R4-23-407(A)(1)).

B. **Indiana:** Prescriptions may only be refilled as authorized by the prescriber and are valid for not more than one year after they are issued. Ind. Code Ann. §§ 25-26-13-25(c), (h)). Prescriptions and drug orders on charts can only be refilled as designated on the prescription or drug order or as authorized by the practitioner. Ind. Code Ann. § 16-42-19-12. Drug orders must state the name of the prescriber and the amount to be dispensed in quantity or days (unless specified by institutional policy or guidelines). Ind. Code Ann. § 16-42-19-3 ("Drug order" defined);

C. **Maine:** A prescription drug order may not be refilled more than 15 months after being written. 02-392-19 Me. Code R. § 5. Drug orders for residents of assisted living facilities should normally note the length of time the medication should be administered and, if not, this is determined by institutional policy. 02-392-1 Me. Code R. § 35; and

D. **Virginia:** Both prescriptions and chart orders (if permitted) must indicate quantity or duration of the order by which the pharmacist can calculate the authorized quantity of the order using the directions for use (18 Va. Admin. Code § 110-20-270(A); 18 Va. Admin. Code § 110-20-286(4)).

159. When a year (or other time designated by law or by the prescriber) has passed from the date that the prescription was issued, the prescription is "**expired**" and the pharmacist must obtain a new or renewed prescription from the patient's prescriber before filling the prescription.

160. When all prescriber authorized refills have been used, the prescription is "**exhausted**," and the pharmacist must obtain a new or renewed prescription from the patient's prescriber before dispensing more prescription drugs.

### C. The Residents of Assisted Living Facilities and the Other Residential Facilities at Issue in This Complaint Do Not Receive Daily Medical Care

161. In skilled nursing facilities and nursing facilities, patients receive daily medical care and are under the regular care and supervision of a physician or other prescriber.

162. By contrast, at assisted living facilities (residential facilities that generally serve elderly people) in the states at issues in this Complaint, residents may receive help with daily activities such as bathing, dressing, and using the bathroom but do *not* receive in-house skilled medical care including prescription monitoring. Residents in assisted living facilities typically rely on their own outside providers for prescriptions and other medical needs.

163. The false claims at issue in this case pertain to expired and exhausted prescriptions for assisted living facilities and other types of residential facilities at which patients do not receive daily healthcare services.

164. For the assisted living facilities (and other residential living facilities at which daily medical care is not provided), the states at issue in this Complaint do not permit prescribers to order (or pharmacies to dispense) unlimited amounts of drugs or unspecified numbers of refills to these residents.

## VII. REMEDI KNOWINGLY CLAIMS PAYMENT FROM GHPS FOR DISPENSING INVALID PRESCRIPTIONS

165. Remedi owns and operates pharmacies that primarily dispense medication to institutions and residential facilities, such as assisted living facilities, nursing facilities, and skilled nursing facilities.

166. Approximately 55–65% of Remedi's patients are Medicare beneficiaries who receive pharmacy services under a Medicare Part D plan administered by a Medicare Part D plan sponsor / PBM (or Medicare Advantage plan likewise administering Medicare Part D benefits).

167. Approximately 25–35% of Remedi's patients are Medicaid beneficiaries who receive Medicaid benefits either directly from the State or from a Medicaid plan.

168. A small percentage of Remedi's patients are beneficiaries of TRICARE.

### A. Remedi Designed Its Computerized Dispensing and Billing Systems to Submit False Claims for Medication Dispensed With Expired or Otherwise Invalid Prescriptions

#### 1. Remedi Designs its Paxit and Framework Systems to Auto-Dispense Expired and Exhausted Prescription Drugs.

169. Over the last twenty years, Remedi used three different computer systems for dispensing prescription drugs.

170. During the 2000s, Remedi used a computerized dispensing and billing system called **Auto-Med** for oral medications that Remedi shipped by mail. When it used Auto-Med, Remedi typically dispensed oral medication in 7, 14, and 30-day packs that were sectioned into sealed plastic bags containing daily medication doses:



171. Remedi billed Medicare Part D and/or Medicaid payors for the entire supply dispensed when it shipped medication through Auto-Med.

172. When a patient's prescription expired or the prescriber authorized refills were exhausted, Remedi's Auto-Med computer system did not automatically refill a prescription. Instead, Auto-Med required Remedi to obtain a valid, renewed prescription from the prescriber before the medication would be dispensed and the payor was billed.

173. This automated barrier to filling expired or exhausted prescription is called a "hard-stop."

174. In approximately September 2009, Remedi began rolling out its **Paxit** computerized, robotic daily dispensing system to replace Auto-Med.

175. For example, Remedi began using Paxit to dispense at its Baltimore,

Maryland facility in approximately September, 2009 and at its Troy, Ohio pharmacy in approximately November, 2012.

176. Paxit is only used for oral prescription medications that are not controlled substances.

177. Paxit is used in most of Remedi's pharmacies to dispense this class of medications, except those in certain localities like Dallas, Texas and Denver, Colorado.

178. The Paxit system puts each tablet or pill into its own individual packaging and then combines all of a patient's daily individually packaged medications (or medications



to be taken at a certain time of day) into one sealed package:

*Meet Paxit*, Remedi SeniorCare, available at https://www.remedirx.com/our-services/paxit-packaging/ (last accessed September 8, 2020).

179. In assisted living facilities and other residential facilities that do not provide healthcare services, sometimes facilities administer the medication and sometimes patients take the medication on their own. Paxit medication packets can be used in both situations, either by placing them into a medication cart for distribution, or the patient can simply be given the packet for self-administration.

180. Remedi has a second computer system currently in use called **Framework**. Framework contains all of Remedi's patients' pharmacy and billing records for dispensed medications, including those dispensed through Paxit.

181. Remedi also uses Framework to manage the dispensing of medication not dispensed by Paxit. These medications include non-oral medication (*e.g.*, inhalers and insulin), controlled substances, bulk nonprescription medication (*e.g.*, laxatives), and oral non-controlled prescriptions dispensed by Remedi's pharmacies in locations that do not use Paxit.

182. When prescriptions are dispensed using Paxit, Remedi bills the GHPs once every month for all drugs dispensed during the prior month on a composite bill prepared in Framework.

183. If a medication is dispensed to a patient for just part of the month, Remedi will only bill for the amount actually dispensed.

184. Most Remedi pharmacies bill near the end of the month.

185. Sometimes, a prescriber cancels the prescription before it is exhausted or expired. When this happens, Remedi stops dispensing the medication, though there is a

two to three-day delay for drugs dispensed by Paxit. Remedi then bills for just the medication dispensed on the monthly billing date.

186. It is well-known in the pharmaceutical industry—and by the public as well—that expired and exhausted prescriptions cannot be dispensed without obtaining a new prescription from a physician or other prescriber.

187. Nevertheless, Remedi chose not to include a "hard stop" in its computer systems to prevent dispensing by Paxit of expired and exhausted medication.

188. Remedi could have included a "hard stop"—the Auto-Med system it replaced with Paxit and Framework had a "hard stop"—but Remedi chose otherwise.

189. Remedi also did not design Framework and Paxit to alert Remedi personnel about the expiration or exhaustion of a patient's prescription so that Remedi could obtain a valid prescription.

190. Rather, Remedi designed Paxit and Framework to continue filling and billing for expired and exhausted prescriptions even when the systems "know" that those prescriptions are no longer valid.

191. Despite switching to a system that automated the dispensing of prescriptions and thus could be programmed to include a "hard stop," Remedi elected not to automatically stop dispensing expired and exhausted prescriptions.

192. Nor did Remedi institute any company-wide process to ensure that expired and exhausted prescriptions were not dispensed, as required by law.

193. Thus, Remedi continued dispensing and billing without asking prescribers whether the dosage or quantity of medication needed to be changed or if the prescription should be discontinued or renewed.

### 2. Remedi Designed Its Computer Systems to Falsify Claims

#### a) Remedi stores copies of prescriptions in Framework and DocuTrack

194. Remedi electronically stores prescriptions in Framework and its imaging software, DocuTrack. Both can be searched and accessed by Remedi's personnel.

195. The prescriptions stored in DocuTrack often contain the date they were written, as well as any other standard prescription information such as the quantity of medication that may be dispensed and whether refills can be dispensed and, if so, how many refills are authorized.

#### b) Remedi designed Framework to display false data about the prescriptions

196. In a compliant pharmacy, the information from prescriptions would be accurately entered into the pharmacy's electronic billing and dispensing systems.

197. For this reason, Framework has fields to record data about the total amount of medication ordered by the prescriber, such as "Fill Quantity Written," "Refills Written," and "Total Quantity Written."

198. Framework also has fields to track the current remaining quantity of medication and number of refills that can still be dispensed to the patient under the prescription, such as "Refills Remaining" and "Quantity Remaining."

199. Remedi chose not to use those Framework fields to keep track of this important prescription quantity and refill limitation information for prescriptions dispensed with Paxit.

200. Instead, these fields in Framework were usually populated with the nullifying entry "0.00."

201. Additionally, Remedi designed Framework so that the data used to populate

claims would not show the actual prescription "Date Written" or the original "Prescription Number" assigned to the prescription when it was first dispensed.

202. Instead, for prescriptions dispensed using Paxit, Remedi populates the "Date Written" field in Framework with the first date in the monthly billing cycle.

203. Even if the actual prescription was written years earlier and had expired, the date written on the claim will still be the first date of the monthly billing cycle.

204. Remedi also designed Framework and Paxit to automatically create fake new prescription numbers every monthly billing cycle.

205. Thus, by design, even if Remedi dispensed medication under an expired or exhausted prescription, the prescription information submitted to the GHP through the Framework software will falsely report a newly prescribed medication to the GHP every time a claim for payment is submitted because it contains a fake new prescription number, often along with a fake new prescription written date.

#### c) **Remedi enters the false data into its claims for payment**

206. Remedi includes these automatically generated (and false) monthly prescription numbers and automatically updated (and false) dates on which the prescription was written in its Framework software claims for payment for regularly filled oral medication dispensed daily in Paxit.

207. Likewise, Remedi's claims for payment for Paxit-dispensed drugs show that the fill number is "0" and the number of refills authorized is "0." These numbers indicate to PBMs and payors that the prescription is new and no refills are allowed.

208. To someone unfamiliar with Remedi's fraudulent scheme, an entry of "0" for number of fills and an entry of "0" for number of refills authorized appears consistent with the newly issued new prescription number and new date written that Remedi also

enters into each monthly claim sent to GHPs.

209. Collectively, these entries falsely indicate that a prescriber is writing a new prescription monthly when claims with these entries are submitted to GHPs through the Framework software.

210. The fake monthly prescription numbers in particular are highly misleading to GHPs because they make it very difficult for GHPs and their contractors to link refills of prescriptions together, particularly when combined with other false statements from Remedi on claims, such as those concerning prescription written dates and fill number. *See* paragraph 152, above.

#### d) **Remedi fails to state truthful data it keeps about the prescriptions on its claims**

211. Framework does show some accurate prescription information internally.

212. For Remedi's own internal use, the Framework system retains the original "Date Written" and "Prescription Number" for the prescription.

213. By default, Framework automatically displays a prescription expiration date of one year from the date the prescription began dispensing. This year date is used even when the prescription is ordered for a shorter period of time. However, when the expiration date passes, the prescription continues to dispense from Paxit.

214. The accurate prescription information is not reported in the claims information that Remedi submits to GHPs.

215. Instead, Paxit continues to dispense medication even when all provider-authorized refills are exhausted. And Framework continues to bill for these drugs dispensed with expired and exhausted invalid prescriptions.

216. Accordingly, prescriptions never "expire" and refills are never "exhausted" in

Remedi's Paxit system and Remedi's Framework billing system.

217. By populating its claims with false data and concealing the date the prescription was actually written, the original prescription number, and the number of fills authorized and already dispensed, Remedi conceals from GHPs the fact that it is dispensing and billing for medication without a valid prescription.

218. Without this information, GHPs cannot accurately assess the validity of the underlying prescription to determine whether the claim should be paid or if the GHP beneficiary's health and safety are at risk due to expiration or exhaustion of their prescription.

219. Since Framework and Remedi's DocuTrack imaging system contain copies of the original prescriptions, Remedi can compare its dispensing information to the actual prescription information and determine whether it has a valid prescription for the medication it is dispensing. Thus, Remedi actually knows its claims are false, acts in deliberate ignorance of the truth or falsity of its claims information, or acts in reckless disregard of the truth or falsity of its claims information.

### B. Other Invalid Prescriptions

220. Remedi's corporate mindset of disregard for basic requirements for dispensing and seeking payment for prescription medication and prioritization of profit over compliance with legal and contractual requirements caused it to make other types of false claims for payment for prescription medication lacking a valid prescription or otherwise not complying with basic prescription validity requirements.

221. Remedi pressured its order entry employees to quickly enter large volumes prescription orders into its computer systems. Likewise, Remedi pressured its pharmacy techs and pharmacists to quickly process and approve prescriptions.

222. Remedi tracks the productivity of these workers.

223. Workers who are productive are further pressured to work faster.

224. This conduct leads to violations that directly and negatively impact the truth, accuracy, and completeness of Remedi's claims for payment to GHPs.

225. These violations include the creation of fake underlying prescriptions; the input of materially inaccurate prescription-related and payor-related data onto claims; and the treating of documentation as a valid prescription even when it does not meet basic requirements to be treated as a prescription.

#### 1. Remedi Falsifies Prescription Labels to Dispense Drugs Lacking a Valid Prescription

226. As explained above, Remedi uses Framework to manage the dispensing of non-oral medication in pharmacies that use the computerized Paxit dispensing system to dispense oral medication. Framework does not auto-dispense.

227. Assisted living facility representatives, such as a medication technician or other employee responsible for administering medication, may request refills of a non-Paxit medication when no more refills are available. In this circumstance, Remedi pharmacy personnel will often create a new label with a new prescription number for noncontrolled prescription medication that is expired or exhausted without obtaining a new prescription from the patient's prescriber.

228. Framework will not show accurate refill information for such prescriptions. Instead, fields associated with refills will display "as written" or "ERX," which means "electronic prescription."

229. Remedi then submits claims for payment for these prescriptions to GHPs even though no valid prescription exists for these medications.

### 2. Remedi Fails to Dispense as Directed by Prescribers

230. In the process of obtaining prior authorizations to bill GHP payors for certain medication when required, Remedi Clinical Service Center department pharmacists would occasionally obtain verbal orders from prescribers to change a patient's medications.

231. Upon receiving a verbal order, Remedi pharmacists would complete a "New RX order" form and send the form to Remedi's Operations Team to change and update the patient's prescription medication. Remedi's Operations Team is responsible for entering medication orders and processing refill requests and includes order entry personnel, customer care representatives, pharmacy technicians, and pharmacists.

232. However, sometimes Operations Team members, primarily from Remedi's Virginia and Maryland pharmacies, failed to process these valid prescriptions and change the patients' medication as ordered by the prescribers.

233. This situation is troubling for patients because prescribers order medication changes for medically necessary reasons as well as to lower medication costs, and these prescription changes are ignored by Remedi personnel responsible for carrying out those changes to prescriptions.

234. Having issued the updated prescription, the patients' prescribers are not notified that their changes were not implemented by Remedi in the dispensed medication.

235. Remedi then submits claims for payment for the incorrectly unchanged prescriptions to GHPs. These claims are false because Remedi failed to dispense the medication as required by the valid prescription but claimed payment as if it had truthfully and accurately dispensed these medications as directed by a valid

prescription.

### 3. Remedi Dispenses Under Documentation That Lacks Basic Prescription Requirements

236. As discussed above at paragraphs 147–53, basic prescription elements must be documented in a prescription for that prescription to be valid. Among these requirements, prescriptions must be issued by an authorized prescriber and must indicate the quantity of medication to be dispensed.

237. Documentation that does not provide quantity information for residents of assisted living facilities (and other facilities at which daily medical care is not provided) in the states at issue in this Complaint does not constitute a valid prescription.

238. Likewise, documentation that has not been signed or otherwise authorized by the prescriber as required by state law does not constitute a valid prescription for residents of such facilities.

239. In 2013 the HHS Office of Inspector General ("**OIG**") examined PDE data from 2009 and found that Medicare Part D inappropriately paid $26.2 million in ten states for drugs ordered by individuals without prescribing authority under state law, including registered nurses and nurse technicians. HHS OIG, Medicare Inappropriately Paid for Drugs Ordered by Individuals Without Prescribing Authority at pp. 11–13 (June 2013), available at https://oig.hhs.gov/oei/reports/oei-02-09-00608.pdf

240. As such, falsely submitting claims for payment for prescription drugs for which the prescription fails to document that it was ordered by an authorized prescriber or fails to specify the quantity to dispense has a natural tendency to influence the Government's payment decision.

241. Because Remedi knows it is required to have documentation to show that

prescription drugs were ordered by an authorized prescriber and that the prescription states the quantity to dispense, Remedi knows that failure to have documentation has a natural tendency to influence the Government's payment decision.

242. Nevertheless, Remedi treats incompletely documented prescriptions as if they were valid prescriptions and dispenses prescription drugs based upon these incomplete or unauthorized prescriptions that are invalid.

243. Then Remedi uses this materially incomplete documentation to claim payment for dispensing prescription medication from GHPs, without disclosing the invalidity of the prescription documentation to GHPs.

244. Remedi's failures in this regard were exacerbated when in the late summer of 2020, Remedi began dispensing prescription medication for new group of assisted living facilities operated by Enlivant in locations such as Portland, Oregon; Indianapolis, Indiana; and Phoenix, Arizona.

245. When a patient changes pharmacies, states have formal procedures that must be followed for the new pharmacy to begin dispensing under an existing prescription. Ariz. Admin. Code § 4-23-407(E) (Arizona); 856 Ind. Admin. Code 1-32-4 (Indiana); OAR 855-041-2115 (Oregon).

246. Remedi did not follow the steps necessary to obtain valid transferred prescriptions from the previous long-term care pharmacy dispensing to these Enlivant facilities when Remedi began servicing this group of assisted living facilities.

247. Nor did Remedi obtain new prescriptions from the patients' physicians or other prescribers.

248. Rather, Remedi obtained from the Enlivant assisted living facilities lists of prescription medications that their prior long-term care pharmacy (Omnicare) had been

dispensing to the residents of these facilities.

249. These lists of medications (reviewed by Relator Griffieth) contained no quantity or duration instructions.

250. But in Indiana, Arizona, and Oregon, prescriptions must specify the quantity of medication to dispense and/or the duration of the dispensing (i.e. how long the prescription should be dispensed). Ariz. Admi. Code §§ 4-23-407(A)(1)(g), 4-23-703(D)(2)(A) (Arizona); Ind. Code Ann. § 16-42-19-7(1) (Indiana); OAR 855-041-1105(1), (2)(c) (Oregon).

251. None of the medication lists reviewed by Relator Griffieth were signed by any physician or other prescriber. Nor was the name of any physician or other authorized prescriber identified on the medication lists reviewed by Relator Griffieth.

252. Indiana and Oregon require that the prescriber authorize or sign the prescription. Ind. Code Ann. §§ 25-26-13-25(c), 16-42-19-12, 16-42-19-7 (Indiana); OAR 855-041-1105(1), 855-041-1120 (Oregon).

253. While prescriptions may be provided orally to the pharmacist or pharmacy technician, the pharmacist or pharmacy tech must promptly reduce the prescription to writing, indicating the prescribers' name. Ariz. Rev. Stat. Ann. § 32-1968(A)(6), (C) (Arizona); Ind. Code Ann. 16-42-19-7(1), (2)(A) (Indiana); OAR 855-041-1105(1), (2), OAR 855-041-1120(1) (Oregon).

254. Remedi neither obtains oral prescriptions for the medication on the Enlivant list nor did Remedi reduce any oral prescriptions to writing with the identity of the prescriber.

255. These prescriptions fail to meet these basic state law prescription validity requirements. Nevertheless, Remedi treats these incomplete Enlivant list of medications

as if they were valid prescriptions, dispensing the medication on the Enlivant list to patients, and billing their GHPs for the medication.

256. Claims for payment Remedi submitted to GHPs for prescription drugs that lack valid prescriptions were false for many of the same reasons described above relating to expired or exhausted invalid prescriptions, including the following:

257. First, such claims for payment seek payment for dispensing a prescription drug that is ineligible for payment.

258. Second, GHPs requires pharmacies to agree to only submit claims that comply with all applicable laws, regulations, and instructions. Claims for medication that lack a valid prescription do not so comply.

259. Third, claims for payment for invalid prescriptions based on documentation that lacks quantity and duration information will necessarily contain express false statements concerning basic prescription information such as the quantity prescribed, fill number, and refills authorized.

### C. Relators Observe Other Facts Indicating Remedi Knew It Was Submitting False Claims

#### 1. Relator Griffieth Observed Remedi Change Its Computer Systems to Remove the Hard Stop That Prevented the Filling of Expired and Exhausted Prescriptions

260. When she worked at Remedi's Troy, Ohio pharmacy from 2011 to 2012, Relator Laura Griffieth was responsible for entering prescriptions for patients from assisted living facilities and other shared adult living facilities into Remedi's Auto-Med computer system.

261. At that time, she observed that a hard stop in the Auto-Med computer system prevented the dispensing of prescription medication when the patient's prescription

expired or the patient had exhausted prescriber authorized refills.

262. Because of her experience with Remedi's older computer system and her knowledge that filling expired or exhausted prescriptions was not permissible, when she returned to Remedi in 2015, Relator Griffieth was surprised that Remedi's new Paxit and Framework computer systems no longer prevented Remedi from filling such invalid prescriptions.

263. Unlike the previous Auto-Med system, Relator Griffieth observed that when a patient's prescription expires or is exhausted, Remedi's Paxit computer system continues to automatically dispense the medication, and neither Paxit nor Framework issue a stop or otherwise alert Remedi personnel that the prescription is expired or otherwise invalid.

264. Relator Griffieth also observed Paxit and Framework automatically changing the prescription number and date written each month.

265. Relator Griffieth asked Remedi pharmacist Brad Luthman why Remedi was filling expired prescriptions. Mr. Luthman stated that he did not understand why either, implicitly acknowledging that these invalid prescriptions should not be filled.

266. Pharmacists in the Clinical Services Department also questioned Remedi's practice of filling expired prescriptions.

267. Relators routinely used the Paxit and Framework systems in managing prior authorizations for prescription medications for Remedi pharmacies nationwide.

268. While using these systems, Relators observed that Remedi dispensed invalid expired and exhausted prescriptions to patients in all states served by Remedi's Paxit-dispensing pharmacies listed in this Complaint.

269. Relators also observed claims data and payment posting data for prescription

medication stored in the Framework system establishing that Remedi submitted or caused the submission of false claims for payment to GHPs for expired and otherwise invalid prescriptions from pharmacies in the states at issue in this Complaint, and that GHPs paid these false claims based on the false statements and data that Remedi reported through its Framework billing software.

270. Relators interacted with billers from all of Remedi's billing departments, which are located in Baltimore, Maryland; Oklahoma City, Oklahoma; Cleveland, Ohio; and Troy, Ohio.

271. These interactions further confirmed the widespread nature of Remedi's schemes.

272. Relators recall receiving no training from Remedi concerning identifying expired or exhausted prescriptions, or how to stop dispensing and billing for such invalid prescriptions.

### 2. Remedi's Corporate Mindset of Disregarding Invalid Prescriptions Leads to Further Creation of Fake Prescriptions

273. Some payors, including Medicare Part D Plan Sponsors and their PBMs as well as Medicaid and Medicaid managed care plans, require pharmacies to obtain prior authorization before dispensing certain medications as a condition of payment.

274. The Clinical Services Center, which Relator Gearhart managed and where Relator Griffieth continues to work, is responsible for obtaining any necessary prior authorizations from GHP payors to authorize payment.

275. To obtain prior authorization from a payor, a valid prescription for the medication must exist.

276. Relator Gearhart and Clinical Services Center employees would sometimes

enter a query into the computer system to look at prescription history. Often, they observed a standard original prescription and then a series of follow on "print screens" that were being used as if they were prescriber-authorized renewed prescriptions after the patients' original prescription was no longer valid.

277. Relator Gearhart learned that internal forms called "print screens" were created by pharmacy staff members to communicate to order entry technicians (who are responsible for entering prescriptions into Remedi's Framework and DocuTrack systems) that a prescription needs to be renewed or re-evaluated. They included the original prescription information. Pharmacy technicians would use the "print screen" to generate a new prescription number in the system even though no new prescription had been written.

278. These new "prescriptions" were then dispensed and billed to GHPs without Remedi actually obtaining a valid prescription. Had a valid prescription been obtained, it would have been present in Remedi's computer system.

279. Relators observed this "print screen" process was used to create fake prescriptions dispensed from Framework, such as for non-oral prescriptions and bulk medications.

280. Remedi knows that a "print screen" form is not a valid prescription and that expired and exhausted prescriptions cannot be legally refilled without new authorization from the patient's prescriber, absent an emergency situation.

281. To Relators' knowledge, none of the Remedi personnel who create these fake prescriptions are licensed to prescribe medication.

### 3. Remedi Talks About Changing its Processes Only After Its Competitor Was Sued for Identical False Claims Act Violations

282. On December 17, 2019, the United States' Complaint-in-Intervention in the *qui tam* False Claims Act case *United States ex rel. Bassan v. Omnicare, Inc.*, No. 1:15-cv-04179-CM (S.D.N.Y. 2015) was unsealed.

283. The United States' Complaint alleges that Omnicare knowingly submitted false claims for payment for prescription drugs that were expired or for which all refills authorized by the prescriber were exhausted because Omnicare's employees were too overwhelmed to obtain updated prescriptions from prescribers. Press coverage of this complaint included Reuters, ABC, and Bloomberg.

284. Three days after the Government's *Omnicare* Complaint was unsealed, Remedi CEO Jeffrey Stamps met with Remedi's General Manager of the Troy, Ohio pharmacy, Fady Elassal; Remedi's Pharmacist in Charge of the Troy, Ohio pharmacy, Brad Peters; and Pharmacy Tech Jenny Moore about Remedi's own failures to obtain valid prescriptions for patients residing in assisted living facilities. This meeting was held at Remedi's Troy, Ohio pharmacy.

285. That same day, Mr. Stamps also contacted Relator Gearhart to schedule a call.

286. On December 23, 2019, Relator Gearhart spoke with Mr. Stamps. He explained that under Remedi's current process not all prescriptions for patients residing in assisted living facilities are valid, but he now wanted the process changed to obtain 100% valid prescriptions.

287. Mr. Stamps said that Remedi had previously not obtained valid prescriptions for all patients in assisted living facilities because it is a manual process (*i.e.*, requiring employee time and effort).

288. Like Remedi, Omnicare dispensed medications without valid prescriptions because obtaining new prescriptions manually was burdensome and time-intensive, according to the Department of Justice's False Claims Act Complaint-in-Intervention.

289. In fact, Mr. Stamps told Relator Gearhart that the reason Remedi's process had to change as soon as possible was that Omnicare had just been sued for dispensing medication to assisted living facility patients without valid prescriptions and he was afraid that a whistleblower from within Remedi could report Remedi to the United States for its identical misconduct.

290. Though Mr. Stamps himself is a pharmacist, he made no mention of any need to change Remedi's ten-year-old practice of filling expired and exhausted prescriptions due to any concern about complying with long-standing laws and contractual requirements, any concern for the health and safety of patients that are the reason for these requirements, or any concern over Remedi's and its pharmacists' professional and ethical obligations to their patients.

291. Mr. Stamps explained that he needed help from Relator Gearhart and her Department (the Clinical Services Center) to obtain valid prescriptions for assisted living facility patients. The Clinical Services Center could help by calling prescription prescribers to get verbal orders for new prescriptions.

292. Relator Gearhart was also told by Mr. Stamps that she had to limit her discussions about this issue.

#### 4. Relators Learn More About Remedi's Misconduct

293. Between January 2020 and June 14, 2020 when she was terminated, Relator Gearhart helped Remedi work on its process for obtaining valid prescriptions for expired and exhausted prescriptions.

294. In January 2020, Relator Gearhart spoke with Remedi pharmacy technician Jenny Moore. At that time, Ms. Moore was the only Remedi employee responsible for obtaining renewed prescriptions for Remedi's Troy, Ohio pharmacy.

295. Relators know of no other Remedi employee like Ms. Moore, who is similarly responsible for obtaining renewed prescriptions for assisted living facility residents at any of Remedi's other pharmacies in January 2020.

296. Ms. Moore showed Relator Gearhart a chart of 15,000 to 16,000 assisted living facility residents who were patients of Remedi's Troy, Ohio pharmacy. She used this chart to keep track of who had valid prescriptions and who did not. There were large gaps in the efficacy of Ms. Moore's process for obtaining renewed prescriptions for assisted living facilities.

297. In addition to her other duties, Ms. Moore was supposed to: (1) identify assisted living residents who needed updated prescriptions; (2) mail these assisted living facilities a list of prescriptions Remedi was filling for each resident; and (3) request that the facility have the medication lists signed and authorized by the resident's physician or other prescriber.

298. These lists were called "Physician Order Sheets" and listed all of the prescription medication and treatments Remedi had on file as an active prescription for each resident.

299. Once signed, the Physician Order Sheets specified that the prescription would be authorized for another six months from the date that they were signed by the patient's prescriber.

300. But often the facilities did not respond or did not respond timely because assisted living facilities typically have no common physician for all of their residents.

301. To get a Physician Order Sheet signed, assisted living facilities either had to contact their residents' physicians or rely on the residents themselves to get their physician to issue them a new prescription.

302. Since Remedi continued to dispense Paxit medication packets every day regardless of the validity of the underlying prescription, assisted living facilities were under no pressure to help Remedi obtain updated prescriptions for their residents.

303. Because the lists were often not returned, Ms. Moore had to take further steps to obtain valid prescriptions, such as by attempting to identify and call the residents' prescribers.

304. The processes of obtaining new prescriptions was often further slowed when Remedi did not have the correct prescriber identified for the prescription in its Framework computer system. This meant that the patient's prescriber was not accurately listed on the Physician Order Sheet provided to the assisted living facilities.

305. Other times Ms. Moore asked pharmacy consultants to remind assisted living facilities to get the Physician Order Sheets signed.

306. In Relator Gearhart's experience, when pharmacy consultants gave these reminders, they had little effect.

307. Given the time-consuming nature of Remedi's chosen process for obtaining renewed prescriptions and Ms. Moore's other prescription compliance duties, Ms. Moore simply did not and could not obtain many needed renewed prescriptions for residents at assisted living facility patients.

308. Remedi did nothing to stop the filling of prescriptions even though it was aware that updated prescriptions had not been obtained from assisted living facilities. Instead, Remedi continued to dispense and bill pursuant to the expired or otherwise

invalid prescriptions.

309. Ms. Moore told Relator Gerhart that she frequently reported to the Pharmacist-in-Charge of the Troy, Ohio pharmacy, Brad Peters, her inability to manually track and obtain prescription renewals.

310. Relator Gearhart also spoke with Brad Peters. Mr. Peters estimated that at least 35%–40% of prescription medication that Remedi dispensed to residents of assisted living facilities from its Troy, Ohio pharmacy were issued under expired or otherwise invalid prescriptions. This was because Ms. Moore's manual process for obtaining valid renewed prescriptions was flawed and unable to address the thousands of invalid prescriptions that Remedi continued filling.

311. Based on Relator's observations and experience, this percentage is unlikely to be lower for Remedi's other pharmacies that use Paxit to dispense medication to residents of assisted living facilities.

312. In mid-January 2020, Mr. Peters told Relator Gearhart that Remedi was changing its process for obtaining valid prescriptions for assisted living facility residents.

313. From February to March 2020, Relator Gearhart participated in at least two conference calls related to Remedi's continued dispensing and billing for expired prescriptions.

314. The other participants in these calls were Remedi Chief Clinical Officer and Corporate Compliance Officer Jennifer Hardesty; Remedi executive Vice President and Chief Operating Officer Mark Schroder (who was previously Vice President of Pharmacy Operations at Omnicare); Remedi General Manager Fady Elassal; and Remedi's Troy, Ohio Pharmacist-in-Charge Brad Peters.

315. Relator Gearhart continued to participate in calls concerning Remedi dispensing and billing for expired prescriptions with Remedi executives and managers in March and April 2020.

316. After the Government sued Omnicare in December 2019, Remedi executives acknowledged openly to each other that Remedi had a problem with dispensing and billing for medication lacking valid prescriptions.

317. In the summer of 2020, Remedi announced a few changes to help avoid liability for submitting claims for payment for expired prescriptions.

318. Remedi began to add features in some markets to track the quantity dispensed.

319. Another change was to enable a feature on its DocuTrack system to fax a message to the prescribers of assisted living facility residents when their prescriptions are nearing expiration and/or exhaustion.

320. Relator Griffieth has not observed that the faxing of reminders has had a significant effect on the number of medications dispensed by Remedi to assisted living facility residents with expired or exhausted prescriptions because even after the prescription expires, Remedi continues dispensing the medication.

321. Remedi ostensibly explained to its personnel that Remedi would no longer fill prescriptions to residents of assisted living facilities more than 30 days after they expire or are exhausted.

322. Even this new policy would not end Remedi's noncompliant behavior because prescriptions cannot be filled after they expire or are exhausted (absent satisfaction of specific emergency procedures in limited situations, but Remedi's practice is not to comply or attempt to comply with those procedures).

323. To date, despite these purported changes, Relator Griffieth has not observed that Remedi engaged any hard stop to prevent the filling of expired or exhausted prescription medication: neither when a prescription expires nor 30 days later.

324. Instead, Relator Griffieth has observed that Remedi's rates of expired prescriptions dispensed at assisted living facilities have been trending higher.

325. Between December 2019 and the present, Remedi continued to submit and cause the submission of false claims for payment to GHPs for medication dispensed without a valid prescription.

326. Further, to Relators' knowledge, Remedi has not reported its misconduct to any GHP to seek guidance or assistance in curing this false billing.

### D. Representative Example False Claims

327. The following are representative examples of Remedi's scheme to submit or cause the submission of false claims to GHPs for prescription medication dispensed without valid prescriptions to all GHPs at issue in this Complaint.

#### 1. Patient 1

328. Patient 1, a Medicare Part D beneficiary, is a resident of an assisted living facility in the Southern District of Ohio.[3] On or around November 22, 2018, Patient 1 was prescribed Simvastatin Tab 40mg tablets with instructions to take "1 tablet by mouth one time a day at bedtime."

329. Simvastatin is a statin medication that can slow the production of cholesterol

---

[3] Additional factual details such as the patient's name, the patient's prescriber, and the facility at which the patient resides are known to Relators and will be produced to Defendants following entry of a suitable Protective Order and a Discovery Request. This information can also be provided *in camera* to the Court if requested. But to preserve patient privacy this identifying information is not provided here.

in the body and decrease cholesterol build-up in artery walls. Prescribers monitor this medication to assess its safety and efficacy, including by checking laboratory results to monitor how well the medication is working and any impact on the patient's liver. This patient is over the age of 89 and so is also at risk for myopathy and muscle pain, which have been associated with use of statins in the elderly. The prescriber should also monitor the patient because cognitive decline and dementia have also been associated with statin therapy.

330. Remedi's Framework system recorded that the prescription had expired and could no longer be filled on or before approximately November 21, 2019. Under Ohio law, any new prescription or refill had to be authorized by the patient's physician or other prescriber. Ohio Admin. Code 4729-5-30(B)(8).

331. Nevertheless, from November 21, 2019 to at least August 19, 2020, Remedi's Troy, Ohio pharmacy dispensed daily oral doses of Simvastatin to Patient 1.

332. Remedi was required to obtain a valid prescription before continuing to dispense this prescription medication to Patient 1 on or before November 21, 2019,

333. Remedi did not obtain a valid renewed prescription for Patient 1's Simvastatin medication authorizing it to continue dispensing this medication after November 21, 2019.

334. Dispensing this medication without a valid prescription is prohibited by law, regulation, and contract, and jeopardizes patient health and safety.

335. Remedi submitted multiple false claims for payment for Medicare Part D federal funds for filling Patient 1's Simvastatin medication to CVS Caremark, the PBM for Patient 1's SilverScript Part D plan, for filling Patient 1's Simvastatin medication after November 21, 2019. For example:

| **Remedi's Claims for Payment for Dispensing Simvastatin to Patient 1 from October 24, 2019 to August 19, 2020** | | | | |
|---|---|---|---|---|
| **Beginning of Dispensing Period** | **Was the Prescription Valid?** | **Qty. Claimed** | **Fake Prescription No.** | **Date Payment Received and "Posted" by Remedi Pursuant to Remedi's Claim for Payment, as Made on or about the Same Date** |
| 10/24/2019 | Only the tablets dispensed before 11/21/2019 had a valid prescription. Tablets dispensed after 11/21/2019 lacked a valid prescription. | 30 (quantity dispensed before 11/21/2019 did not lack a valid prescription) | RX no. xxxxxx1a[4] | 11/25/2019 |
| 11/23/2019 | No | 30 | RX no. xxxxxx1b | 12/24/2019 |
| 12/23/2019 | No | 30 | RX no. xxxxxx1c | 01/22/2020 |
| 01/22/2020 | No | 30 | RX no. xxxxxx1d | 02/21/2020 |
| 02/21/2020 | No | 30 | RX no. xxxxxx1e | 03/23/2020 |
| 03/22/2020 | No | 30 | RX no. xxxxxx1f | 04/21/2020 |
| 04/21/2020 | No | 30 | RX no. xxxxxx1g | 05/21/2020 |
| 05/21/2020 | No | 30 | RX no. xxxxxx1h | 06/22/2020 |
| 06/20/2020 | No | 30 | RX no. xxxxxx1i | 07/20/2020 |

[4] The prescription numbers are redacted but placeholder identifiers have been provided. The actual fake prescription numbers are known to Relators. Because prescription numbers are supposed to be unique identifiers when combined with other data (*see* paragraph 152, above), they can be considered to be protected health information. The actual prescription numbers are available for *in camera* review and will be produced to defendants following entry of a Protective Order and proper request.

| **Remedi's Claims for Payment for Dispensing Simvastatin to Patient 1 from October 24, 2019 to August 19, 2020** | | | | |
|---|---|---|---|---|
| **Beginning of Dispensing Period** | **Was the Prescription Valid?** | **Qty. Claimed** | **Fake Prescription No.** | **Date Payment Received and "Posted" by Remedi Pursuant to Remedi's Claim for Payment, as Made on or about the Same Date** |
| 07/20/2020 | No | 30 | RX no. xxxxxx1j | 08/19/2020 |
| 08/19/2020 | No | 30 | RX no. xxxxxx1k | -- |

336. These claims were false for several reasons. Medicare Part D will only reimburse pharmacies for drugs that are eligible for payment. 42 U.S.C. § 1395w–112(b)(1); 42 C.F.R. § 423.505(i)(3)(iii), (i)(3)(v) (2010). These drugs dispensed after November 21, 2019 were not eligible for payment because they were dispensed without a valid prescription. 42 C.F.R. §§ 423.100 ("valid prescription"), 423.104(h) (2012); Ohio Admin. Code 4729-5-30(B)(8). In addition, these claims were false because Remedi agreed to comply with all applicable laws, regulations, and CMS instructions, and these claims did not comply because they were made for medication under an invalid expired prescription. *Id.*, 42 C.F.R. § 423.505(i)(3)(v) (2010). Furthermore, these Remedi false claims for payment contained false statements concerning the prescription number, the date the prescription was written, the fill number, and refills authorized.

337. For example, Remedi submitted a claim for payment to CVS/Caremark as the PBM for Patient 1's Part D SilverScript plan on or about August 19, 2020 for dispensing a 30-day supply of Simvastatin starting July 20, 2020 to Patient 1.

338. This claim falsely stated that the prescription for this medication was written on July 20, 2020.

339. This claim falsely stated that the Fill Number for this claim was "0," a code indicating that this was the first time this prescription had been filled.

340. This claim also falsely stated that the Number of Refills Authorized (by the prescriber) was "0."

341. Instead of truthfully disclosing that this medication is being dispensed pursuant to the same prescription since November 2018, Remedi knowingly fabricated prescription numbers (*e.g.* RX no. xxxxxx1j for this claim) every month to avoid having the claim rejected.

342. On August 19, 2020, CVS/Caremark paid Remedi $31.23 for this claim on behalf of Patient 1's Part D SilverScript Plan, using money provided in whole or in part by the United States.

### 2. Patient 2

343. Patient 2, a TRICARE beneficiary, is a resident of an assisted living facility in the Southern District of Ohio.

344. In Ohio, Remedi asked assisted living facilities to have a prescriber sign a Physician Order Sheet prescribing every residents' medication (except for controlled substances) for a six month period.

345. On June 14, 2019, a licensed practical nurse (LPN) signed the Physician Order Sheet for Patient 2 at Patient 2's assisted living facility and faxed it to Remedi.

346. The Physician Order Sheet authorized Remedi to refill prescriptions for medications including Rivaroxaban (Xarelto) 15mg tablets for six months.

347. Xarelto is an anticoagulant, or blood thinner, which can prevent blood clots from forming. If a patient has reduced kidney function, it can affect a body's ability to eliminate this medication. This causes Xarelto to accumulate in the body, leading to

bleeding. In addition, sometimes the medication may not work, putting the patient at risk of developing blood clots, heart attacks, and strokes. Because of these potential side effects, Xarelto has to be closely monitored in patients, especially in elderly patients.

348. By December 15, 2019, the June 14, 2019 Physician Order Sheet expired. Under Ohio law, any new refill had to be authorized by the patient's physician or other prescriber. Ohio Admin. Code 4729-5-30(B)(8).

349. Nevertheless, for at least the following nine months, from December 15, 2019 to at least August 19, 2020, Remedi's Troy, Ohio pharmacy dispensed daily oral doses of Xarelto to Patient 2.

350. Before continuing to refill this medication after December 15, 2019, Remedi was required to obtain a valid prescription.

351. Remedi did not obtain a valid renewed prescription for Patient 2's Xarelto medication authorizing it to continue dispensing this medication after December 15, 2019.

352. Dispensing this medication without a valid prescription is prohibited by law, in addition to jeopardizing patient health and safety.

353. Remedi submitted multiple false claims for payment with federal funds to Express Scripts, the PBM for the TRICARE program, in connection with filling Patient 2's Xarelto medication after December 15, 2019. For example:

| **Remedi's Claims for Payment for Dispensing Xarelto Tab 15 mg to Patient 2 from November 23, 2019 to August 19, 2020** | | | | |
|---|---|---|---|---|
| **Beginning of dispensing period** | **Was the Prescription Valid?** | **Qty. Claimed** | **Fake Prescription No.** | **Date Payment Received and "Posted" by Remedi Pursuant to Remedi's Claim for Payment, as Made on or about the Same Date** |
| 11/23/2019 | Only the tablets dispensed before 12/15/2020 had a valid prescription. Tablets dispensed after 12/15/2020 lacked a valid prescription. | 30 | RX no. xxxxxx2a | 12/24/2019 |
| 12/23/2019 | No | 30 | RX no. xxxxxx2b | 01/22/2020 |
| 01/22/2020 | No | 30 | RX no. xxxxxx2c | 02/21/2020 |
| 02/21/2020 | No | 30 | RX no. xxxxxx2d | 03/23/2020 |
| 03/22/2020 | No | 30 | RX no. xxxxxx2e | 04/21/2020 |
| 04/21/2020 | No | 30 | RX no. xxxxxx2f | 05/21/2020 |
| 05/21/2020 | No | 30 | RX no. xxxxxx2g | 06/22/2020 |
| 06/20/2020 | No | 30 | RX no. xxxxxx2h | 07/20/2020 |
| 07/20/2020 | No | 30 | RX no. xxxxxx2i | 08/19/2020 |
| 08/19/2020 | No | 30 | RX no. xxxxxx2j | 10/06/2020 |

354. These claims were false for several reasons. TRICARE will only pay pharmacies for drugs dispensed with a prescribed drug prescription. *See* 32 C.F.R. § 199.4(a), (a)(1)(i). Since Patient 2 had no existing valid prescription, Remedi's claims thus sought payment for dispensing prescription drugs that are ineligible for payment. Furthermore, Remedi's certifications that it has or will provide sufficient information to allow the government to make an informed payment decision are false because these claims fail to disclose that no valid prescription existed. Likewise, Remedi's certifications that Remedi agreed to comply with applicable laws, regulations, and program instructions is false because the prescription medication was not dispensed

under a valid prescription as required by law. Ohio Admin. Code 4729-5-30(B)(8). Furthermore, these Remedi false claims for payment contained false statements concerning the prescription number, the date the prescription was written, the fill number, and refills authorized. Since these statements on the claims were false, certifications that these claims were true, accurate, and complete were also false.

355. For example, Remedi submitted a claim for payment to Express Scripts as the TRICARE PBM on or about August 19, 2020 for dispensing a 30-day supply of Xarelto starting on July 20, 2020.

356. This claim falsely stated that the prescription for this medication was written on July 20, 2020.

357. This claim falsely stated that the Fill Number for this claim was 0, a code indicating that this was the first time this prescription had been filled.

358. This claim also falsely stated that the Number of Refills Authorized was 0.

359. Instead of truthfully disclosing that this medication was being dispensed pursuant to the same prescription since June 2019, Remedi knowingly fabricated false prescription numbers every month (*e.g.*, here RX no. xxxxxx2i) to avoid having the claim rejected.

360. On August 19, 2020, Remedi was paid by Express Scripts $442.90 for this claim for payment on behalf of TRICARE, using money provided in whole or in part by the United States.

### 3. Patient 3

361. Patient 3, a TRICARE beneficiary, is a resident of an assisted living facility in the Southern District of Ohio.

362. On or around April 6, 2019, Patient 3 was prescribed Januvia 100mg tablets

with instructions to take "1 tablet by mouth one time a day."

363. Januvia is an oral medication used for Type 2 diabetes. The dosing of Januvia requires adjustments based on the patient's current renal function. Elderly patients are at risk of reduced renal function and require routine laboratory monitoring to assess their renal function as well as their overall diabetes management. Dosing of Januvia must be reduced when the renal function declines. This is to avoid accumulation of Januvia in the body and resultant potential adverse reactions and side effects that are associated with it.

364. According to Remedi's Framework system, this prescription expired and could no longer be filled no later than approximately April 5, 2020.

365. Nevertheless, from April 5, 2020 to at least October 19, 2020, Remedi's Troy, Ohio pharmacy dispensed daily oral doses of Januvia to Patient 3.

366. Before continuing to refill this medication after April 5, 2020, Remedi was required to obtain a valid prescription. Under Ohio law, any new refill had to be authorized by the patient's physician or other prescriber. Ohio Admin. Code 4729-5-30(B)(8).

367. Remedi did not obtain a valid renewed prescription for Patient 3's Januvia authorizing it to continue dispensing this medication after April 5, 2020.

368. Dispensing this medication without a valid prescription is prohibited by law, in addition to jeopardizing patient health and safety.

369. Remedi submitted multiple false claims for payment from federal funds to Express Scripts, the PBM for the TRICARE program, in filling Patient 3's Januvia medication after April 5, 2020. For example:

| Remedi's Claims for Payment for Dispensing Januvia to Patient 3 from March 22, 2020 to October 19, 2020 | | | | |
|---|---|---|---|---|
| **Beginning of Dispensing Period** | **Was the Prescription Valid?** | **Qty. Claimed** | **Fake Prescription No.** | **Date Payment Received and "Posted" by Remedi Pursuant to Remedi's Claim for Payment, as Made on or about the Same Date** |
| 03/22/2020 | Only the tablets dispensed before 4/5/2020 had a valid prescription. Tablets dispensed after 4/5/2020 lacked a valid prescription. | 30 | RX no. xxxxxx3a | 04/21/2020 |
| 04/21/2020 | No | 30 | RX no. xxxxxx3b | 05/21/2020 |
| 05/21/2020 | No | 30 | RX no. xxxxxx3c | 06/22/2020 |
| 06/20/2020 | No | 30 | RX no. xxxxxx3d | 07/20/2020 |
| 07/20/2020 | No | 30 | RX no. xxxxxx3e | 08/19/2020 |
| 08/19/2020 | No | 30 | RX no. xxxxxx3f | 10/06/2020 |
| 09/18/2020 | No | 30 | RX no. xxxxxx3g | 10/19/2020 |

370. These claims were false for several reasons. TRICARE will only pay pharmacies for drugs dispensed with a prescribed drug prescription. See 32 C.F.R. § 199.4(a), (a)(1)(i). Since Patient 3 had no existing valid prescription, Remedi's claims thus sought payment for dispensing prescription drugs that are ineligible for payment. Furthermore, Remedi's certifications that it has or will provide sufficient information to allow the government to make an informed payment decision are false because these claims fail to disclose that no valid prescription existed. Likewise, Remedi's certifications that Remedi agreed to comply with applicable laws, regulations, and

program instructions is false because the prescription medication was dispensed without a valid prescription as required by law. Ohio Admin. Code 4729-5-30(B)(8). Furthermore, these Remedi false claims for payment contained false statements concerning the prescription number, the date the prescription was written, the fill number, and refills authorized. Since these statements on the claims were false, certifications that these claims were true, accurate, and complete were also false.

371. For example, Remedi submitted a claim for payment to Express Scripts as the PBM for TRICARE on or about September 28, 2020 for dispensing a 30-day supply of Januvia starting August 19, 2020 to Patient 3.

372. This claim falsely stated that the prescription for this medication was written on August 19, 2020.

373. This claim falsely stated that the Fill Number for this claim was 0, a code indicating that this was the first time this prescription had been filled.

374. This claim also falsely stated that the Number of Refills Authorized was 0.

375. Instead of truthfully disclosing that this medication was being dispensed pursuant to the same prescription since April 2019, Remedi knowingly fabricated a false prescription number every month (*e.g.*, here RX no. xxxxxx3f) to avoid having the claim rejected.

376. On October 6, 2020, Express Scripts paid Remedi $437.34 for Remedi's claim for payment on behalf of TRICARE, using money provided in whole or in part by the United States.

#### 4. Patient 4

377. Patient 4, a Medicare Part D beneficiary, is a resident of an assisted living facility in Virginia.

378. On or around January 27, 2020, Patient 4 was prescribed Myrbetriq 25mg tablets (extended release), with instructions to take "1 tablet by oral route every day swallowing whole with water. Do not crush, chew and/or divide."

379. Myrbetriq is a medication used to address an overactive bladder. The medication needs to be closely monitored to avoid side effects, to optimize the dose, and for assessment of the effectiveness of the medication. The physician should order renal function tests since dose adjustments may be needed for any reduction in the patient's renal (kidney) function. Likewise, a reduction in liver function may indicate a lower dose of Myrbetriq is needed. Mybetriq should be used with caution in patients with renal or liver impairment.

380. Thirty tablets were ordered dispensed and three refills were authorized on the prescription.

381. Thus, after Remedi dispensed 120 tablets, this prescription was exhausted and could no longer be dispensed.

382. Under Virginia law, prescriptions and chart orders have to indicate "a quantity or duration of the order by which the pharmacist can calculate the authorized quantity using directions for use." 18 Va. Admin. Code § 110-20-270(A).

383. Therefore, once the indicated quantity of Myrbetriq was dispensed by Remedi, no further Myrbetriq was authorized by the prescriber to be dispensed without a new prescription.

384. Nevertheless, from March 25, 2020 (when Remedi began dispensing under this January 27, 2020 prescription) to at least November 1, 2020, Remedi's Richmond, Virginia pharmacy dispensed daily doses of Myrbetriq to Patient 4.

385. No later than when Remedi dispensed 120 tablets, on July 22, 2020, Remedi

was required to obtain a valid prescription before continuing to dispense Myrbetriq to Patient 4.

386. Remedi did not obtain a valid renewed prescription for Patient 4's Myrbetriq medication authorizing it to continue dispensing this medication after July 21, 2020.

387. Dispensing this medication without a valid prescription is prohibited by law, regulation, and contract and jeopardizes patient health and safety.

388. Remedi submitted multiple false claims for payment for Medicare Part D federal funds for filling Patient 4's Myrbetriq medication to Prescriptions Solutions, the PBM for Patient 4's Optum Part D plan, after July 21, 2020. For example:

| **Remedi's Claims for Payment for Dispensing Myrbetriq to Patient 4 from March 25, 2020 to October 30, 2020** | | | | |
|---|---|---|---|---|
| **Beginning of Dispensing Period** | **Was the Prescription Valid?** | **Qty. Claimed** | **Fake Prescription No.** | **Date Payment Received and "Posted" by Remedi Pursuant to Remedi's Claim for Payment, as Made on or about the Same Date** |
| 03/25/2020 | Yes | 2 | RX no. xxxxxx4a | 03/26/2020 |
| 03/25/2020 | Yes | 7 | RX no. xxxxxx4b | 04/06/2020 |
| 03/30/2020 | Yes | 2 | RX no. xxxxxx4c | 03/31/2020 |
| 04/04/2020 | Yes | 30 | RX no. xxxxxx4d | 05/05/2020 |
| 05/04/2020 | Yes | 30 | RX no. xxxxxx4e | 06/04/2020 |
| 06/03/2020 | Yes | 30 | RX no. xxxxxx4f | 07/03/2020 |
| 07/03/2020 | Only the first 19 tablets had a valid prescription. The next 11 tablets lacked | 30 | RX no. xxxxxx4g | 08/03/2020 |

| **Remedi's Claims for Payment for Dispensing Myrbetriq to Patient 4 from March 25, 2020 to October 30, 2020** | | | | |
|---|---|---|---|---|
| **Beginning of Dispensing Period** | **Was the Prescription Valid?** | **Qty. Claimed** | **Fake Prescription No.** | **Date Payment Received and "Posted" by Remedi Pursuant to Remedi's Claim for Payment, as Made on or about the Same Date** |
| | a valid prescription. | | | |
| 08/02/2020 | No | 30 | RX no. xxxxxx4h | 09/02/2020 |
| 08/28/2020 | No | 2 | RX no. xxxxxx4i | 08/26/2020 |
| 09/01/2020 | No | 30 | RX no. xxxxxx4j | 10/02/2020 |
| 10/01/2020 | No | 30 | RX no. xxxxxx4k | 11/01/2020 |

389. These claims were false for several reasons. Medicare Part D will only reimburse pharmacies for drugs that are eligible for payment. 42 U.S.C. § 1395w–112(b)(1); 42 C.F.R. § 423.505(i)(3)(iii), (i)(3)(v) (2010). These drugs dispensed after July 21, 2020 were not eligible for payment because they were dispensed without a valid prescription. 42 C.F.R. §§ 423.100 ("valid prescription"), 423.104(h) (2012); 18 Va. Admin. Code § 110-20-270(A) (authorized quantity to dispense is quantity specified on prescription). In addition, these claims were false because Remedi agreed to comply with all applicable laws, regulations, and CMS instructions, and these claims did not comply because they were made for medication under an invalid expired prescription. *Id.*, 42 C.F.R. § 423.505(i)(3)(v) (2010). Furthermore, these Remedi false claims for payment contained false statements concerning the prescription number, the date the prescription was written, the fill number, and refills authorized.

390. For example, Remedi submitted a claim for payment to Prescription Solutions

as the PBM for Patient 4's Part D Optum plan on or about November 1, 2020 for dispensing to Patient 4 a 30-day supply of Myrbetriq starting October 1, 2020.

391. This claim falsely stated that the prescription for this medication was written on October 1, 2020.

392. This claim falsely stated that the Fill Number for this claim was 0, a code indicating that this was the first time this prescription had been filled.

393. This claim also falsely stated that the Number of Refills Authorized (by the prescriber) was 0.

394. Instead of truthfully disclosing that this medication is being dispensed pursuant to the same prescription since March 25, 2020, Remedi knowingly fabricated false prescription numbers (*e.g.*, here RX no. xxxxxx4k) every month to avoid having the claim rejected.

395. On November 1, 2020, Prescription Solutions paid Remedi for this claim on behalf of Patient 4's Part D Optum Plan, using money provided in whole or in part by the United States.

### 5. Patient 5

396. Patient 5, a Medicare Part D beneficiary, is a resident of an assisted living facility operated by Enlivant in the state of Indiana.

397. Patient 5's Enlivant assisted living facility is one of the assisted living facilities discussed above at paragraphs 244–59 that switched from Omnicare to Remedi in late summer, 2020.

398. At the time of the transition, Enlivant provided Remedi with a list of Patient 5's active medications (which printed on an Omnicare "Physician's Order" form).

399. This list, dated June 30, 2020 included a 100 Units/mL vial of Lantus with

directions to inject 20 units subcutaneously every evening. The prescription number listed for this medication was RX no. xxxxxx5a. The list of medications was signed by a registered nurse.

400. Lantus is an injectable long-acting insulin. It is used to treat patients with both Type 1 and Type 2 diabetes. Lantus requires close monitoring to ensure the correct dose of insulin is prescribed to avoid potentially life-threatening hypoglycemia (low blood sugar) and hyperglycemia (high blood sugar). Physicians monitor blood tests for hemoglobin A1C regularly in diabetic patients to help evaluate the effectiveness of the insulin dose and to manage diabetes. Additional routine lab tests in diabetic patients include creatinine, potassium, blood glucose, sodium, and a lipid panel.

401. No physician name nor the name of any other valid prescriber was listed on this documentation, as required by Indiana. Ind. Code Ann. § 16-42-19-7; Ind. Code Ann. § 16-42-19-12.

402. In Indiana, Advanced Practice Nurses may prescribe when certain requirements are met. 848 Ind. Admin. Code 5-1-1(a). There is no such procedure in Indiana for registered nurses to gain prescriptive authority.

403. The medication list stated that it was printed on June 18, 2020 and was for July 2020. No other medication duration or quantity limit was stated on this medication list. No refills were specified.

404. Thus, by operation of Indiana law, since this prescription was written for July, 2020, it expired on July 31, 2020. Ind. Code Ann. § 25-26-13-25(c); Ind. Code Ann. § 16-42-19-12.

405. Remedi did not start dispensing any medication to Patient 5 until August, 2020.

406. In particular, Remedi did not start dispensing Lantus to Patient 5 until October 29, 2020, when Remedi's Troy, Ohio pharmacy dispensed a 100 Units/mL vial of Lantus to Patient 5.

407. Even if the June 30, 2020 medication list was a valid prescription it had already expired by October 29, 2020, when the Lantus was actually dispensed.

408. Nevertheless, on October 29, 2020 Remedi's Troy, Ohio pharmacy dispensed a 100 Units/mL vial of Lantus to Patient 5.

409. Thus, before filling this medication in October 2020, Remedi was required to obtain a valid prescription that was both signed by an authorized provider and that actually authorized this fill.

410. Remedi did not obtain a valid renewed prescription for Patient 5's Lantus medication.

411. Dispensing this medication without a valid prescription is prohibited by law, in addition to jeopardizing patient health and safety.

412. On or about October 30, 2020, Remedi submitted a false claim for payment for Medicare Part D federal funds to Prescription Solutions, the PBM for Patient 5's Optum plan, for filling Patient 5's Lantus medication. The prescription number listed for this medication by Remedi was RX no. xxxxxx5b. This prescription number was false because it was different than the prescription number on the Omnicare "Physician's Order" form provided to Remedi.

413. This claim falsely stated a 28-day supply was dispensed.

414. The vial Remedi dispensed only contained a 5-day supply of medication.

415. This claim also falsely stated that the Number of Refills Authorized (by the prescriber) was 12.

416. The prescription did not authorize any refills.

417. This claim was also false because Medicare Part D will only reimburse pharmacies for drugs that are eligible for payment. The vial of Lantus that Remedi dispensed on October 29, 2020 was not eligible for payment because it was dispensed without a valid prescription: the prescription failed to identify the prescriber or provide the prescriber's signature, was not authorized by a prescription prescriber, and was not issued for the time period in which the medication was dispensed.

418. In addition, this claim was false because Remedi agreed to comply with all applicable laws, regulations, and CMS instructions, and these claims did not comply because they were made for medication dispensed without a valid prescription. Furthermore, these Remedi false claims for payment contained false statements concerning the number of refills authorized, and the days' supply dispensed.

419. On October 30, 2020, Prescription Solutions paid Remedi $256.01 for this Remedi claim on behalf of Patient 5's Part D Optum Plan, using money provided in whole or in part by the United States.

## VIII. False Claims to Government Healthcare Programs for Drugs Already Paid for by Government Health Care Programs as Part of the Skilled Nursing Facility or Hospice Benefit

420. Part A of the Medicare Program authorizes payment of federal funds for post hospital extended care services and certain other extended care services at a **skilled nursing facility** for up to 100 days during any spell of illness (42 U.S.C. § 1395d(a)(2)(A), (f)) and for end-of-life **hospice** care (see generally 42 U.S.C. §§ 1395c–1395h).

421. **Skilled Nursing Facility Coverage**: To qualify for a skilled nursing home benefit, a physician (or other specified provider) must certify that the patient requires

daily skilled nursing care and/or skilled rehabilitation services that as a practical matter, can only be performed on an inpatient basis in a skilled nursing facility; and that addresses a condition for which the patient received treatment in a qualified hospital stay or that arose while the patient received care in a skilled nursing facility. 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31.

422. As part of the Part A skilled nursing facility benefit, Medicare pays for drugs and biologicals furnished to patients while receiving post-hospital care at a skilled nursing facility. 42 C.F.R. § 409.25(a).

423. Medicare Part A reimburses skilled nursing facilities for these covered costs through the Prospective Payment System. 42 U.S.C. § 1395yy(e). Pursuant to the Prospective Payment System, skilled nursing facilities are reimbursed for these covered costs at the adjusted federal per diem rate applicable to each facility. 42 U.S.C. § 1395yy(e)(1)(B).

424. Medicaid and TRICARE also offer skilled nursing facility coverage.

425. Prescribed drugs dispensed to Medicaid and TRICARE beneficiaries using skilled nursing facility benefits are already covered by the applicable GHPs as part of their payments to these providers. *See* 42 C.F.R. §§ 483.1(b), 483.45 (Medicaid); 32 C.F.R. § 199.6(b)(1), TRICARE Reimbursement Manual 6010.61-M, chapter 8, section 1, paragraph 4.2.14.2 (April 1, 2015) (TRICARE).

426. **Hospice Coverage:** When a physician certifies that the patient has a life expectancy of six months or less, a patient may elect hospice care in lieu of other benefits. 42 C.F.R. § 418.22(a)(1), (b)(1), (c), 42 U.S.C. § 1395d(a)(4).

427. Should a patient elect hospice coverage, all care related to their terminal condition is covered as part of the Part A benefit. 42 C.F.R. §§ 418.24, 417.531, 417.585.

Such care must be furnished in compliance with Federal, State, and local laws and regulations. 42 C.F.R. § 418.116.

428. This hospice coverage includes drugs used for pain relief and control of symptoms related to the terminal illness. 42 C.F.R. § 418.202(f). Hospice providers must obtain these drugs from a pharmacist (42 C.F.R. § 418.406(c)(1)) and provide them under the direction of a pharmacist (42 C.F.R. § 418.106, 418.106(a)(1)).

429. Medicare Part A pays hospice providers for covered hospice care—including drugs—at a daily fixed payment rate that depends on the level of care provided to the patient. 42 C.F.R. § 418.302.

430. TRICARE also offers hospice coverage.

431. Prescribed drugs dispensed to TRICARE beneficiaries using hospice (for drugs related to the terminal illness) benefits are already covered by TRICARE as part of their payments to these providers. *See* TRICARE Reimbursement Manual 6010.61-M, chapter 11, section 2, paragraphs 3.2.6, 3.2.6.1 and section 3, paragraphs 3.2.1.8, 3.2.1.8.2 (April 1, 2015) (TRICARE).

432. Drugs are not eligible for Medicare Part D coverage when coverage is already available under Medicare Part A. 42 U.S.C. §1395w-102(e)(2)(B).

433. The federal Government has issued publications demonstrating the material harm that falsely claiming payment to the Medicare Part D program for drugs already covered by Medicare Part A's skilled nursing facility and hospice benefits can cause.

434. In 2009, HHS OIG found that Medicare Part D paid for 1.2 million drugs amounting to $75 million for beneficiaries in Part A skilled nursing facility stays in 2006, and the majority of these payments were most likely inappropriate. HHS OIG, Medicare Part D Payments for Beneficiaries in Part A Skilled Nursing Facility Stays in

2006 (June 2009), available at https://oig.hhs.gov/oei/reports/oei-02-07-00230.pdf

435. Likewise, in August 2019, the HHS OIG reported that Medicare Part D paid an estimated $160.8 million for drugs that hospices should have directly paid as part of the hospice benefit. As a result, CMS paid twice for the same drugs. HHS OIG, Medicare Part D is Still Paying Millions for Drugs Already Paid For Under the Part A Hospice Benefit, (Aug. 2019), available at https://oig.hhs.gov/oas/reports/region6/61708004.pdf

436. Furthermore, because prior "reviews have identified separate payments that should have been covered under the per diem payments made to hospice organizations," HHS OIG is currently continuing to review the issue of payments made outside of the hospice benefit. HHS OIG, Medicare Payments Made Outside of the Hospice Benefit (accessed Oct. 16, 2020), available at https://oig.hhs.gov/reports-and-publications/workplan/summary/wp-summary-0000238.asp

437. Since GHPs will not pay twice for the same medication, claims submitted to Medicare Part D, Medicaid, and TRICARE programs for prescription drug benefits that are actually covered under Medicare Part A and other GHP's skilled nursing facility and hospice benefits are false.

438. Because such false claims cause GHPs to pay twice for the same prescription drugs, if the GHPs knew about such false claims, that knowledge would have a natural tendency to influence their payment decisions.

439. Remedi also knows that having to inappropriately pay twice for the same prescription medication has a natural tendency to influence the Government's payment decision.

440. Relators observed that Remedi dispenses drugs to patients who are in a

skilled nursing facility stay and does not bill these drug disbursements to the patients' skilled nursing facilities.

441. Likewise, Relators observed that Remedi dispenses medication related to patients' hospice terminal condition symptoms and pain relief and does not bill these drugs disbursements to the patients' hospice providers.

442. Instead of billing these drugs to skilled nursing facilities or hospices for reimbursement by these providers as part of the GHPs' skilled nursing facility and hospice benefits, Relators observed that Remedi bills these drugs to Medicare Part D plan sponsors, Medicaid, and TRICARE's prescription benefit programs in violation of Government laws, regulations, and instructions.

443. Remedi does not bill skilled nursing facilities and hospices directly as required by GHPs because it takes additional time to resolve billing issues with these providers and billing the patients' other payors is often easier and faster.

444. Remedi's policy is that skilled nursing facilities and hospices should not be directly billed for prescription medication unless Remedi first submits a claim for payment to the patients' other GHP prescription drug benefits insurance and the claim has been denied because the patient is in a covered hospice or skilled nursing facility stay.

445. Accordingly, Remedi usually does not enter skilled nursing facility and hospice information into a patient's file so that the GHP's (Medicare Part D, Medicaid, and TRICARE) prescription drug benefits program will continue to be billed for medications that should be billed to skilled nursing facilities and hospices.

446. When Clinical Services Center employees saw these incorrect billings to GHP prescription drug benefits programs, Relator Gearhart directed the employees to inform

Remedi's Billing Department of the errors so that the Billing Department could correct the inappropriate billing and correctly bill skilled nursing facilities or hospices.

447. This type of inappropriate billing also began when Remedi began using Paxit to dispense oral noncontrolled substances. Remedi has been submitting such false claims since 2009.

448. Relators have observed this inappropriate billing in all states served by Remedi's Paxit-dispensing pharmacies as pled in this Complaint.

449. On or about May 28, 2020, a representative of a managed care organization administering prescription drug benefits for Ohio's Medicaid Program, Paramount, called Relator Griffieth about a Remedi claim for payment seeking Medicaid payment for drugs dispensed to a patient using a skilled nursing facility benefit.

450. The Paramount representative told Relator Griffieth that Remedi should have billed the skilled nursing facility and that Remedi would likely be audited if it did not stop billing Medicaid for drugs dispensed to patients using skilled nursing facility benefits.

451. Relator Griffieth sent an email on this topic to Remedi's Billing Department, forwarding the claim denial fax she also received from the Paramount representative. Relator Griffieth received no response.

452. Representatives of Medicaid managed care plans and Medicare Part D plans similarly cautioned Remedi that they cannot be billed for medication dispensed to patients in skilled nursing facility stays or who have elected hospice.

453. Relator Griffieth personally reported these GHP messages to Remedi's Billing Department.

454. Despite Relators' efforts to correct these issues by forwarding the warnings

about the inappropriate billings to Remedi's Billing Department, Remedi has not stopped its scheme of double billing GHPs for drugs that were already paid for by Medicare Part A, Medicaid, and TRICARE as part of the skilled nursing facility and hospice benefit.

455. Remedi knows that, by law, it cannot directly bill any GHP for drugs dispensed to patients using their skilled nursing facility benefit or to patients who have elected a hospice benefit covering pain relief or control of symptoms relating to a patient's terminal illness. Likewise, Remedi knows that it must directly bill those patients' skilled nursing facilities and hospices. Nevertheless, Remedi knowingly submits false claims for double payment for such drugs directly to Part D, Medicaid, and TRICARE payors.

456. These claims are also false because by law (42 C.F.R. § 423.505(i)(3)(v), (i)(4)(iv) (2010) (Medicare Part D); by contract (Medicaid); or by certification (TRICARE Operations Manual 6010.59-M, ch. 8, Sec. 1, paragraph 3.1.3 (April 1, 2015)), pharmacies may only submit claims that comply with all applicable laws, regulations and instructions.

457. The pharmacy's submission of false claims also causes false statements on certifications by the pharmacies and false statements on annual certifications by the Part D Plan Sponsors.

458. These false claims are material to the United States because they result in Government funds being expended twice for the same prescription drugs.

### A. Representative Example False Claims

459. The following are representative examples of Remedi's scheme to submit false claims for payment to Medicare Part D, Medicaid, and TRICARE prescription drug

benefits programs, when these drugs should have been billed to the patients' skilled nursing facility or hospice provider.

### 1. Patient 6

460. From approximately 2016 to the present, Priority Partners, which is an administrator of Maryland Medicaid, has sent numerous communications to Remedi denying claims for payment for prescription drug benefits made on behalf of Maryland Medicaid patients who were receiving skilled nursing facility benefits.

461. These communications had been routinely observed by Remedi's Baltimore Billing Department and the Clinical Services Center.

462. The head of Remedi's Baltimore Billing Department, Sandy Owen, was well aware that Priority Partners should not be billed for prescription drugs for patients who were receiving skilled nursing facility benefits.

463. From time to time Ms. Owen communicated with Relator Gearhart and Remedi Clinical Services Center technician Skylar Canan about Remedi's need to comply with the skilled nursing facility billing requirement.

464. Nevertheless, Remedi routinely submitted false claims for payment to Priority Partners claiming payment for Medicaid funds for Maryland Medicaid patients receiving skilled nursing facility benefits, even though Maryland Medicaid had already paid for these prescriptions as part of the patients' skilled nursing facility benefit.

465. As of February 4, 2020, Patient 6, a Maryland Medicaid beneficiary, was admitted to a skilled nursing facility in Maryland in a covered stay paid per diem.

466. When a patient is a skilled nursing facility stay, the skilled nursing facility sends the prescription requests directly to Remedi.

467. Patient 6's Maryland Medicaid benefits were administered by Priority

Partners.

468. On February 14, 2020, Remedi's Baltimore, Maryland pharmacy dispensed a thirty-day supply of Kombiglyze XR to Patient 6. Remedi's prescription number was RX no. xxxxxx6a.

469. On or about February 14, 2020, Remedi submitted a claim for payment to Priority Partners for dispensing Kombiglyze XR to Patient 6 while Patient 6 was receiving skilled nursing facility benefits.

470. Kombiglyze XR is a combination prescription medicine containing saxagliptin and metformin hydrochloride. It can be used to help control high blood sugar (hyperglycemia) in adults with type 2 diabetes.

471. This claim was false because Medicaid will not reimburse pharmacies for drugs dispensed to patients who are in a skilled nursing facility stay. Those pharmaceuticals are covered as part of the per diem facility charge. *See* 42 C.F.R. §§ 483.1(b), 483.45; *see also* Md. Code Regs. 10.09.10.01(B)(27)(a), (a)(i), (B)(34)(b); Md. Code Regs. 10.09.10.10(A)(2).

472. Remedi's claim thus sought payment for dispensing prescription drugs that are ineligible for payment.

473. In addition, this claim was false because Remedi agreed to comply with all applicable laws, regulations, and instructions, and this claim did not comply because it did not comply with Medicaid coverage requirements.

474. Remedi's certification in submitting the claim that it was true, accurate, and complete was also false because the claim was not true, accurate, and complete since it did not comply with Medicaid coverage requirements.

475. Remedi's decision to submit or cause the submission of false claims for

payment for prescriptions dispensed without a valid prescription despite laws, regulations, and contractual requirements clearly limiting reimbursement to drugs dispensed pursuant to valid prescriptions is a knowing, material violation of the False Claims Act.

476. Remedi was paid $830.75 by Priority Partners for its February 14, 2020 claim for payment using federal and state funded Maryland Medicaid funds.

477. In fact, on dispensing a different prescription to Patient 6 on a later date, Priority Partners examined a prior authorization request from Remedi and denied coverage of the drug as a direct prescription benefit because the patient was in a skilled nursing facility. By contrast, Remedi did not submit a prior authorization request for the Kombiglyze medication.

478. Specifically, on March 5, 2020, Priority Partners wrote to Remedi rejecting a prior authorization request submitted by Remedi requesting Maryland Medicaid prescription drug benefit coverage for a different prescription medication, Lidocaine 5% (700 mg) Adhesive Patch.

479. The communication from Priority Partners explained that it was denying Medicaid prescription benefit coverage because the patient was in a skilled nursing facility stay and so the skilled nursing facility should be billed for medications:

> Dear [Remedi representative]:
>
> The Prior Authorization Request you submitted for the above member has been received. We are writing to let you know that we have dismissed your request for coverage of the drug requested.
>
> The request was dismissed due to the following reason:
>
>> Not eligible for coverage review through the pharmacy department. The member's outpatient pharmacy benefits are not to be used

> during the Skilled Nursing Facility [stay]. Dispensing pharmacy should bill the Skilled Nursing Facility for medications[.]

### 2. Patient 7

480. Patient 7, a Medicare Part A and D beneficiary, is a resident of an assisted living facility in the Southern District of Ohio.

481. As of October 4, 2020, Patient 7 had elected to exercise her Medicare Part A hospice benefit.

482. On October 4, 2020, Patient 7 was prescribed Morphine Sulfate (Roxanol) for pain relief, Ativan for anxiety relief, and oxygen.

483. Roxanol and Ativan are drugs commonly used in hospice to relieve, respectively, pain and anxiety, which are symptoms very commonly related to patients' terminal conditions. Oxygen is also commonly prescribed to hospice patients.

484. Roxanol (morphine) was prescribed in a concentration of 20 mg per ml to be taken in doses of 5 mg (0.25 ml) sublingual (under the tongue) every eight hours for pain. No refills were authorized on this prescription.

485. The prescription order that Remedi received on October 4, 2020 was signed by the hospice nurse on behalf of the patient's hospice physician. On this hospice fax order, both the physician and the nurse were identified as working for Vitas, a well-known hospice provider.

486. On October 4, 2020, Remedi's Troy, Ohio pharmacy dispensed 7.5 ml of Roxanol to Patient 7, which was a 10-day supply. Remedi's prescription number was RX no. xxxxxx7a.

487. Even though Remedi knew that Patient 7 had elected hospice benefits, on October 4, 2020, Remedi submitted a false claim for payment to Prescription Solutions,

the PBM for Patient 7's Medicare Part D plan sponsor, Optum for dispensing this medication.

488. This claim was false because Medicare Part D will not reimburse pharmacies for drugs dispensed to patients who have elected Medicare Part A hospice coverage.

489. Remedi's claim thus sought payment for dispensing prescription drugs that were ineligible for payment.

490. In addition, this claim was false because Remedi agreed to comply with all applicable laws, regulations, and CMS instructions, and this claim did not comply because it did not comply with Medicare coverage requirements.

491. Another issue with Remedi's claim for payment for dispensing this Roxanol is that Remedi's claim falsely stated that eight refills of this controlled substance had been authorized by the prescriber.

492. A prescription for a level II controlled substance such as Roxanol can be partially filled multiple times, but in total no more than a 60 day supply can be dispensed under a single prescription to a terminally ill patient. 21 C.F.R. § 1306.13(b); Ohio Admin. Code 4729-5-26(a)(1)(C). Had all eight refills been dispensed, the patient would have been dispensed more than a 60-day supply of this medication.

493. In actuality, no refills of level II controlled substances are permitted. 21 U.S.C. § 829(a).

494. On October 4, 2020, Optum's PBM Prescription Solutions paid Remedi $6.13 for this claim for payment, using money provided in whole or in part by the government.

## COUNT ONE
## False Claims Act: Presentation of False Claims In Violation of 31 U.S.C. § 3729(a)(1)(A)

495. Relators reallege and incorporate the preceding paragraphs as if set forth fully herein.

496. Defendants, acting in concert under common direction and control, by and through their officers, members, agents, and employees took the actions relating to the conduct alleged above.

497. For the reasons set forth in this Complaint, Defendants knowingly presented or caused to be presented materially false or fraudulent claims for payment or approval to the United States and/or the United States' contractors, grantees, or other recipients in violation of 31 U.S.C. § 3729(a)(1)(A).

498. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi presented or caused to be presented a claim for payment or approval in violation of the law was a false or fraudulent claim.

499. Defendants "knowingly" violated the False Claims Act, as that term is defined in 31 U.S.C. § 3729(b)(1). As to each of the above allegations, Defendants acted with actual knowledge of the alleged information, in deliberate disregard of the truth or falsity of the alleged information, and/or in reckless disregard of the truth or falsity of the alleged information.

500. Unaware of the falsity of the claims presented or caused to be presented by the Defendants, the United States and the GHPs would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had they known the truth.

501. Defendants' actions have damaged and continue to damage the United States in substantial amounts to be determined at trial.

502. The United States is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim presented or caused to be presented by Defendants.

**COUNT TWO**
**False Claims Act: False Records or Statements**
**in Violation of 31 U.S.C. § 3729(a)(1)(B)**

503. Relators reallege and incorporate the preceding paragraphs as if set forth fully herein.

504. Defendants, acting in concert under common direction and control, by and through their officers, members, agents, and employees took the actions relating to the conduct alleged above.

505. For the reasons set forth in this Complaint, Defendants knowingly made, used, or caused to be made or used materially false or fraudulent statements material to false or fraudulent claims to the United States and/or the United States' contractors, grantees, or other recipients, in violation of 31 U.S.C. § 3729(a)(1)(B).

506. Each expired or otherwise invalid prescription or double-billed prescription for which Defendants submitted or caused to be submitted a claim for payment in violation of the law contained false or fraudulent records or statements made, used, or caused to be made or used by Defendants that were material to a false or fraudulent claim.

507. Unaware of the falsity of the records or statements made, used, or caused to be made or used by the Defendants, the United States and the GHPs would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had they known the truth.

508. Defendants "knowingly" violated the False Claims Act, as that term is defined in 31 U.S.C. § 3729(b)(1). As to each of the above allegations, Defendants acted with actual knowledge of the alleged information, in deliberate disregard of the truth or falsity of the alleged information, and/or in reckless disregard of the truth or falsity of the alleged information.

509. As a result, the United States suffered actual damages in an amount to be determined at trial.

510. The United States is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim presented or caused to be presented by Defendants.

## COUNT THREE
## Against Defendant Remedi SeniorCare of Ohio, LLC
## False Claims Act: Retaliatory Actions in Violation of 31 U.S.C. § 3730(h)

511. Relator Maureen Gearhart realleges and incorporates the preceding paragraphs as if set forth fully herein.

512. Relator Gearhart worked for Remedi SeniorCare of Ohio, LLC on an independent contractor basis from April 2000 until April 2003.

513. Remedi SeniorCare of Ohio, LLC hired Relator Gearhart as an employee in April 2003.

514. In approximately June 2015, she was promoted to the position of Director of the Clinical Services Center.

515. In approximately 2017, she was promoted to the position of Vice President of the Clinical Services Center.

516. She was terminated on Sunday June 14, 2020.

517. During her employment with Remedi SeniorCare of Ohio, LLC, Relator

Gearhart objected to the practices of Remedi SeniorCare of Ohio (as well as its corporate parent and sister entities) that she reasonably believed violated laws, regulations, or instructions, or constituted possible fraud against the Government.

518. In approximately 2017, Remedi entered the Colorado long term care pharmacy market by purchasing a pharmacy in Colorado.

519. In Colorado, Kaiser Permanente is a major sponsor of Part D plans.

520. Kaiser's Part D plans require plan beneficiaries residing in assisted living facilities to only obtain prescriptions from Kaiser's mail order pharmacy.

521. By contrast, Kaiser will allow residents of skilled nursing facilities and nursing facilities to obtain prescriptions from outside pharmacies like Remedi.

522. One of the required codes that must be entered on claims to Part D plans is a facility code indicating where a patient resides.

523. For example, one code indicates that a patient resides at a nursing facility (defined to also include skilled nursing facilities), while another code indicates that a patient resides at an assisted living facility.

524. Kaiser's Part D Colorado plans automatically reject claims for payment made for medication dispensed to patients if they are submitted with a facility code disclosing that the patient resides in an assisted living facility.

525. Remedi's Central Rejects Department processes claims information for Colorado medications to make sure claims will be paid.

526. In approximately January 2018, Relator Gearhart and her employees in the Clinical Services Center observed that Remedi's Central Rejects Department was entering the patient residence code for "nursing facility" instead of the code for "assisted living facility" on claims for patients who resided in assisted living facilities.

527. These claims had been already rejected by Kaiser because they had been correctly submitted with the correct residence code for assisted living facility.

528. Remedi was falsely entering the patient residence code for "nursing facility" on these claims to get Kaiser to pay the claims, contrary to the terms of Kaiser's coverage rules.

529. Remedi's falsification of the patient residence codes troubled the Clinical Service Center employees because this designation was false and contradicted Remedi's prior billing compliance directives.

530. Before Remedi's acquisition of the Colorado pharmacy, in approximately July 2017, Remedi Director of Medical Billing Nancy Bridgman gave a billing in-service presentation to Remedi employees directing that the patient residence code should never be changed solely to allow a claim to be paid.

531. When the Clinical Service Center employees saw that Remedi was putting incorrect facility codes into claims information to get claims to Kaiser paid, they brought this issue to Relator Gearhart's attention, showing her the slide from Billing Director Bridgeman's PowerPoint directing that the facility code should never be changed just to get claims paid.

532. Over the next two years, Relator Gearhart directed her Clinical Services Center employees to raise these billing compliance failures with the Remedi Central Rejects Department and alert them to specific instances of incorrect billing observed by the Clinical Services Center.

533. In approximately January, 2018, a Remedi employee in the Central Rejects Department claimed that an unnamed Kaiser representative said it was acceptable for Remedi to change the facility code in this fashion.

534. This information was vague, not in writing, and contradicted Kaiser's written coverage rules as well as the prior written directives of Director Bridgman.

535. In order to verify this representation from the Central Rejects Department, two other Remedi employees contacted Kaiser to determine whether Kaiser had changed its coverage rules and would pay Remedi for dispensing medication to residents of assisted living facilities. Kaiser did not provide a waiver or give Remedi written permission to use incorrect facility codes for assisted living facility residents solely to circumvent coverage rules prohibiting payment for these claims.

536. Relator Gearhart and Remedi Patient Account Director Nikki Palmer provided this information to Medical Billing Director Bridgman and to Rasesh Patel, Remedi's Vice President of Finance Operations.

537. Nevertheless, Remedi continued to submit claims for federal funds to Kaiser that stated false facility codes.

538. When this billing noncompliance continued, Relator Gearhart informed Remedi Compliance Office Jennifer Hardesty and then later, CEO Jeffrey Stamps.

539. In approximately mid-2019, Remedi Third Party Plan Contracting Director, Susan Vogel, emailed Relator Gearhart, Ms. Bridgman, and Ms. Palmer, stating again that Remedi is not permitted to put incorrect residence codes on claims for payment for assisted living residents that were submitted to Kaiser's Part D plans.

540. In approximately May 2019, Relator Gearhart informed her own boss, Remedi Chief Operating Officer Mark Schroder, of this issue.

541. Around the same time, Relator Gearhart emailed Medical Billing Director Bridgeman; Remedi Chief Operating Officer Mark Schroeder; Remedi Chief Financial Officer John Gould; Remedi Compliance Office, Jennifer Hardesty; and Remedi Vice

President of Finance Operations Rasesh Patel.

542. In her email, Relator Gearhart explained that Remedi's Central Rejects Department was still stating incorrect facilities codes on claims to Kaiser for its assisted living facility residents. Relator asked to see any documentation from Kaiser approving this.

543. Ms. Bridgman admitted Remedi had no documentation from Kaiser allowing this deviation from Kaiser's Part D plan requirements.

544. Ms. Bridgman also said that she was working with Kaiser's PBM Optum on this issue and that if she did not have written approval by June 2019, Remedi would discontinue this practice.

545. Relator Gearhart responded by email stating that the only thing she was trying to do was to make sure Remedi is compliant.

546. Remedi never received written approval from Kaiser to put incorrect patient residence code on claims for patients residing in assisted living facilities solely to get claims for these patients paid in violation of the requirements of Kaiser's Part D plans.

547. On approximately June 4, 2020, Relator Gearhart was notified that Remedi's Central Rejects Department had again changed the residence code on a claim in Colorado to a Kaiser Part D plan from "assisted living facility" to "nursing facility" to get a claim paid.

548. On or about June 4, 2020, Relator Gearhart sent another email to Remedi's Compliance Department to inform them that Remedi was continuing to use incorrect residence codes on claims for assisted living facility residents submitted to Kaiser's Part D plans solely to get those claims paid.

549. Approximately ten days later, on Sunday June 14, 2020, Remedi's Corporate

Counsel Kathleen Chagnon and Compliance Officer Jennifer Hardesty called Relator Gearhart and terminated her over the phone, stating that the reason for her firing was that Remedi no longer had confidence that Relator Gearhart could lead her department and because she had supposedly broken Remedi's IT policy.

550. Defendant Remedi SeniorCare of Ohio, LLC's stated reasons for firing Relator Gearhart were pretextual.

551. Relator had received a promotion to Vice President in 2017 for reasons including the quality of her leadership over her Department. She was recognized with discretionary merit increases in compensation annually.

552. Remedi's claim that Relator Gearhart was fired for committing an "IT" violation was also pretextual.

553. On information and belief, other employees were not terminated without warning for the same alleged violation.

554. Relator was actually fired because she had insisted on Remedi's compliance with Medicare Part D program coverage requirements.

555. Relator Gearhart reasonably believed that an accurate facility code was a known condition of payment from Kaiser's Part D plans and that Kaiser would not cover and pay for these drugs if they had been submitted with the truthful facility code, that Remedi knew this, but that Remedi was allowing false statements and claims to be submitted anyway.

556. Relator Gearhart also reasonably believed that compliance with this Kaiser coverage requirement was material to the United States.

557. She believed that the reason Kaiser required that prescriptions to assisted living facilities be dispensed by its own mail order pharmacy was that Kaiser could

provide these medications from its own mail order pharmacy at less expense to its Part D plans than what these plans would pay Remedi and other outside pharmacies.

558. Relator Gearhart also believed that this benefitted the federal Government by keeping the Part D costs lower.

559. Thus, Relator Gearhart had a reasonable belief that she was stopping the submission of false claims and false statements to the Medicare Part D program for federal funds.

560. Relator Gearhart's efforts to stop Remedi's potential violations of the False Claims Act were activities that are protected by 31 U.S.C. § 3730(h)(1).

561. Defendant Remedi SeniorCare of Ohio, LLC knew that its business practices included the submission of claims to federally funded Medicare Part D that stated false patient residence code, that Kaiser had twice rejected Remedi's request to approve these false statements, that Kaiser and its PBM had not approved this practice in writing, and that these Part D claims would be denied if they had contained a truthful facility code.

562. Thus, Defendant Remedi SeniorCare of Ohio, LLC knew these false records and statements were or could be a violation of the False Claims Act.

563. Defendant Remedi SeniorCare of Ohio, LLC reasonably knew or should have known that Relator Gearhart was engaging in protected activity by attempting to stop these practices.

564. Nevertheless, Defendant Remedi SeniorCare of Ohio, LLC discriminated against Relator Gearhart because of her efforts to stop violations or potential violations of the False Claims Act and what Relator Gearhart reasonably believed were efforts to stop violations of the False Claims Act.

565. Because of her lawful acts and other efforts to stop Defendants' violations of

the False Claims Act, Defendant Remedi SeniorCare of Ohio, LLC illegally retaliated against Relator Gearhart in violation of 31 U.S.C. § 3730(h)(1) by terminating her on June 14, 2020.

566. Pursuant to 31 U.S.C. § 3730(h)(2), Relator Gearhart is entitled to all relief necessary to make her whole, including reinstatement with the same seniority status she would have had but for the discrimination, front pay, two times the amount of back pay, interest on the back pay, and compensation for all special damages sustained, including litigation costs and attorneys' fees.

**COUNT FOUR**
**Against Defendant Remedi SeniorCare of Ohio, LLC**
**Age Discrimination – Ohio R.C. Chapter 4112**

567. Relator Maureen Gearhart realleges and incorporates the preceding paragraphs as if set forth fully herein.

568. Relator Maureen Gearhart is a female born in 1964.

569. Throughout her nearly 20 years of tenure with Defendants, Gearhart was a loyal and dedicated employee. She was well regarded in her capacity as Vice President of the Clinical Services Center and her performance was recognized with discretionary merit increases in compensation annually.

570. Gearhart was abruptly terminated on June 14, 2020.

571. Gearhart had received no warnings or progressive disciplinary action prior to being terminated.

572. Defendants allege that Gearhart committed an IT violation and that Defendants had lost confidence in her ability as a leader.

573. Gearhart is aware of significantly younger male employees who were given training she was not given. On information and belief, they were not terminated without

warning for comparable alleged performance deficiencies.

574. Kevin Subler, a significantly younger male employee with less experience and tenure was promoted to Pharmacist in Charge of the Clinical Services Center and assumed Gearhart's duties.

575. Defendants' articulated reasons for terminating Plaintiff were a false pretext for discriminating and terminating Plaintiff because of her age.

576. Gearhart is over 40 years old.

577. Defendants intentionally discriminated against Gearhart on the basis of her age by, including but not limited to, treating her less favorably than similarly situated, significantly younger employees and terminating her employment in violation of R.C. Chapter 4112.

578. Defendants' conduct was willful, intentional, wanton, malicious, and in conscious disregard of Gearhart's rights.

579. As a direct and proximate result of Defendants' unlawful conduct, Gearhart has suffered injury and damage and is entitled to relief.

## COUNT FIVE
## Violations of the Colorado Medicaid False Claims Act
## C.R.S. 25.5-4-304 to 25.5-4-310

580. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

581. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the State of Colorado in violation of the Colorado Medicaid False Claims Act, C.R.S. 25.5-4-304 to 25.5-4-310.

582. Each expired or otherwise invalid prescription or double-billed prescription

for which Remedi submitted or caused to be submitted a claim for payment to Colorado's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

583. The State of Colorado, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State known the truth.

584. Defendants' actions have damaged and continue to damage the State of Colorado in substantial amounts to be determined at trial.

585. The State of Colorado is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT SIX**
**Violations of the Delaware False Claims and Reporting Act**
**6 Del. C. §§ 1201 to 1211**

586. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

587. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the State of Delaware in violation of the Delaware False Claims and Reporting Act, 6 Del. C. §§ 1201 to 1211.

588. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to Delaware's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

589. The State of Delaware, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State known the truth.

590. Defendants' actions have damaged and continue to damage the State of Delaware in substantial amounts to be determined at trial.

591. The State of Delaware is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT SEVEN**
**Violations of the District of Columbia False Claims Act**
**D.C. Code §§ 2-381.01 to 2-381.07**

592. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

593. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the District of Columbia in violation of the District of Columbia False Claims Act, D.C. Code §§ 2-381.01 to 2-381.07.

594. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to District of Columbia's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

595. The District of Columbia, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the District

known the truth.

596. Defendants' actions have damaged and continue to damage the District of Columbia in substantial amounts to be determined at trial.

597. The District of Columbia is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT EIGHT**
**Violations of the Florida False Claims Act**
**Fla. Stat. §§ 68.081 to 68.092**

598. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

599. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the State of Florida in violation of the Florida False Claims Act, Fla. Stat. §§ 68.081 to 68.092.

600. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to Florida's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

601. The State of Florida, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State known the truth.

602. Defendants' actions have damaged and continue to damage the State of Florida in substantial amounts to be determined at trial.

603. The State of Florida is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT NINE**
**Violations of the Georgia Taxpayer Protection False Claims Act**
**O.C.G.A. §§ 23-3-120 to 23-3-127**
**and**
**Georgia State False Medicaid Clams Act**
**O.C.G.A. §§ 49-4-168 to 49-4-168.6**

604. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

605. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the State of Georgia in violation of the Georgia Taxpayer Protection False Claims Act, O.C.G.A. §§ 23-3-120 to 23-3-127, Georgia State False Medicaid Clams Act, O.C.G.A. §§ 49-4-168 to 49-4-168.6.

606. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to Georgia's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

607. The State of Georgia, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State known the truth.

608. Defendants' actions have damaged and continue to damage the State of Georgia in substantial amounts to be determined at trial.

609. The State of Georgia is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TEN
## Violations of the Illinois False Claims Act
## 740 ILCS 175/1 to 740 ILCS 175/8

610. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

611. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the State of Illinois in violation of the Illinois False Claims Act, 740 ILCS 175/1 to 740 ILCS 175/8.

612. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to Illinois' Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

613. The State of Illinois, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State known the truth.

614. Defendants' actions have damaged and continue to damage the State of Illinois in substantial amounts to be determined at trial.

615. The State of Illinois is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT ELEVEN
## Violations of the Indiana False Claims Act
## IC §§ 5-11-5.5-1 to 5-11-5.5-18
## and the Medicaid False Claims and Whistleblower Protection Act
## IC §§ 5-11-5.7-1 to 5-11-5.7-18

616. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

617. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the State of Indiana in violation of the Indiana False Claims Act (through June 30, 2014) and the Indiana Medicaid False Claims and Whistleblower Protection Act, IC §§ 5-11-5.7-1 to 5-11-5.7-18 (from July 1, 2014 to the present).

618. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to Indiana's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

619. The State of Indiana, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State known the truth.

620. Defendants' actions have damaged and continue to damage the State of Indiana in substantial amounts to be determined at trial.

621. The State of Indiana is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWELVE
## Violations of the Louisiana Medical Assistance Programs Integrity Law
## La. R.S. §§ 46:437.1 to 46:440.3

622. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

623. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the State of Louisiana in violation of Louisiana Medical Assistance Programs Integrity Law, La. R.S. §§ 46:437.1 to 46:440.3.

624. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to Louisiana's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

625. The State of Louisiana, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State known the truth.

626. Defendants' actions have damaged and continue to damage the State of Louisiana in substantial amounts to be determined at trial.

627. The State of Louisiana is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT THIRTEEN
## Violations of the Maryland False Health Claims Act
## Md. Health-General Code Ann. §§ 2-601 to 2-611

628. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

629. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the State of Maryland in violation of the Maryland False Health Claims Act, Md. Health-General Code Ann. §§ 2-601 to 2-611.

630. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to Maryland's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

631. The State of Maryland, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State known the truth.

632. Defendants' actions have damaged and continue to damage the State of Maryland in substantial amounts to be determined at trial.

633. The State of Maryland is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT FOURTEEN**
**Violation of the Michigan Medicaid False Claims Act**
**MCLS §§ 400.601 to 400.615**

634. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

635. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the State of Michigan in violation of the Michigan Medicaid False Claims Act, MCLS §§ 400.601 to 400.615.

636. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to Michigan's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

637. The State of Michigan, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State known the truth.

638. Defendants' actions have damaged and continue to damage the State of Michigan in substantial amounts to be determined at trial.

639. The State of Michigan is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT FIFTEEN**
**Violation of the Minnesota False Claims Act**
**Minn. Stat. §§ 15C.01 to 15C.16**

640. Relators incorporate by reference and re-allege the preceding paragraphs as if

fully set forth herein.

641. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the State of Minnesota in violation of the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 to 15C.16.

642. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to Minnesota's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

643. The State of Minnesota, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State known the truth.

644. Defendants' actions have damaged and continue to damage the State of Minnesota in substantial amounts to be determined at trial.

645. The State of Minnesota is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT SIXTEEN
## Violation of the New Hampshire Medicaid Fraud and False Claims Act
## N.H. Rev. Stat. §§ 167:61-b to 167:61-e

646. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

647. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the

State of New Hampshire in violation of the New Hampshire Medicaid Fraud and False Claims Act, N.H. Rev. Stat. §§ 167:61-b to 167:61-e.

648. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to New Hampshire's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

649. The State of New Hampshire, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State known the truth.

650. Defendants' actions have damaged and continue to damage the State of New Hampshire in substantial amounts to be determined at trial.

651. The State of New Hampshire is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT SEVENTEEN
## Violation of the Oklahoma Medicaid False Claims Act
## 63 Okla. St. §§ 5053 to 5053.7

652. Relators incorporate by reference and re-alleges the preceding paragraphs as if fully set forth herein.

653. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the State of Oklahoma in violation of the Oklahoma Medicaid False Claims Act, 63 Okla. St. §§ 5053 to 5053.7.

654. Each expired or otherwise invalid prescription or double-billed prescription

for which Remedi submitted or caused to be submitted a claim for payment to Oklahoma's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

655. The State of Oklahoma, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State known the truth.

656. Defendants' actions have damaged and continue to damage the State of Oklahoma in substantial amounts to be determined at trial.

657. The State of Oklahoma is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT EIGHTEEN**
**Violation of the Rhode Island False Claims Act**
**R.I. Gen. Laws §§ 9-1.1-1 to 9-1.1-9**

658. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

659. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the State of Rhode Island in violation of the Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 to 9-1.1-9.

660. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to Rhode Island's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

661. The State of Rhode Island, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State known the truth.

662. Defendants' actions have damaged and continue to damage the State of Rhode Island in substantial amounts to be determined at trial.

663. The State of Rhode Island is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT NINETEEN**
**Violation of the Tennessee Medicaid False Claims Act**
**Tenn. Code Ann. §§ 71-5-181 to 71-5-185**

664. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

665. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the State of Tennessee in violation of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 to 71-5-185.

666. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to Tennessee's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

667. The State of Tennessee, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State

known the truth.

668. Defendants' actions have damaged and continue to damage the State of Tennessee in substantial amounts to be determined at trial.

669. The State of Tennessee is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNTY TWENTY**
**Violation of the Texas Medicaid Fraud Prevention Act**
**Tex. Hum. Res. Code §§ 36.001 to 36.117**

670. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

671. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the State of Texas in violation of Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001 to 36.117.

672. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to Texas' Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

673. The State of Texas, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the State known the truth.

674. Defendants' actions have damaged and continue to damage the State of Texas in substantial amounts to be determined at trial.

675. The State of Texas is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT TWENTY ONE**
**Violation of the Virginia Fraud Against Taxpayers Act**
**Va. Code Ann. § 8.01-216.1 to 8.01-216.19**

676. Relators incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

677. For the reasons set forth in this Complaint, Defendants knowingly submitted or caused to be submitted materially false claims and false statements and records to the Commonwealth of Virginia in violation of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 to 8.01-216.19.

678. Each expired or otherwise invalid prescription or double-billed prescription for which Remedi submitted or caused to be submitted a claim for payment to Virginia's Medicaid program in violation of the law was a false or fraudulent claim and/or a false or fraudulent record or statement.

679. The Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, would not have paid for the expired or otherwise invalid prescriptions or double-billed prescriptions had the Commonwealth known the truth.

680. Defendants' actions have damaged and continue to damage the Commonwealth of Virginia in substantial amounts to be determined at trial.

681. The Commonwealth of Virginia is entitled to the maximum available damages and statutory penalties for every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## PRAYER FOR RELIEF

Relators, on behalf of themselves, the United States of America, and the Plaintiff States, respectfully ask this Court to enter judgment against Defendants, and each of them, as follows:

(a) That this Court enter judgment against the Defendants jointly and severally in an amount equal to three times the amount of damages the United States Government and the Plaintiff States have sustained because of Defendants' actions, plus the maximum amount of civil penalties for each action in violation of 31 U.S.C. § 3729(a) and the State False Claims Acts, and the costs of this action, with interest, including the costs to the United States Government and the Plaintiff States for their expenses related to this action;

(b) That Relators be awarded all costs incurred, plus reasonable attorneys' fees and expenses, in accord with 31 U.S.C. § 3730(d) and the State False Claims Acts;

(c) That Relators be awarded the maximum amount of the proceeds allowed pursuant to the 31 U.S.C. § 3730(d) and the State False Claims Acts;

(e) That, pursuant to 31 U.S.C. § 3730(c)(5) and the State False Claims Acts, Relators be awarded a share of any alternate remedy that the United States Government or the Plaintiff States elect to pursue;

(f) That permanent injunctive relief be granted to prevent any recurrence of the False Claims Act conduct described above for which redress is sought in this Complaint;

(g) That the United States, the Plaintiff States, and the Relators be awarded prejudgment and post judgment interest; and

(h) That the United States, the Plaintiff States, and the Relators receive all

relief, both at law and in equity, to which they may be reasonably entitled.

* * *

Relator Gearhart, on behalf of herself, respectfully asks this Court to enter judgment against Defendant Remedi SeniorCare of Ohio, LLC, on Count Three, as follows:

(i) That this Court enter judgment against Remedi SeniorCare of Ohio, LLC in an amount equal to the amount of damages Relator Gearhart has sustained because of Remedi SeniorCare of Ohio, LLC's actions in violation of 31 U.S.C. § 3730(h)(1), and award all relief necessary to make her whole, including reinstatement with the same seniority status she would have had but for the discrimination, front pay, two times the amount of back pay, interest on the back pay, and compensation for all special damages sustained, including litigation costs and reasonable attorneys' fees;

(j) That Relator Gearhart be awarded prejudgment and post judgment interest; and

(k) That Relator Gearhart receive all relief, both at law and in equity, to which she may be reasonably entitled.

* * *

Relator Gearhart, on behalf of herself, respectfully asks this Court to enter judgment against Defendant Remedi SeniorCare of Ohio, LLC, on Count Four, as follows:

(l) That Defendants be enjoined from further unlawful conduct as described in the Complaint;

(m) That Gearhart be reinstated in her employment;

(n) That Gearhart be awarded all lost pay and benefits;

(o) That Gearhart be awarded compensatory damages;

(p) That Gearhart be awarded punitive damages;

(q) That Gearhart be awarded liquidated damages;

(r) That Gearhart be awarded pre-judgment and post-judgment interest;

(s) That Gearhart be compensated for the adverse tax consequences of receiving a lump sum award rather than her compensation over several, separate tax years;

(t) That Gearhart be awarded reasonable attorneys' fees and costs;

(u) That Gearhart be awarded all other legal and equitable relief to which she may be entitled.

Respectfully submitted this December 2, 2020,

s/ Erin M. Campbell
James B. Helmer, Jr. (0002878)
Julie Webster Popham (0059371)
Erin M. Campbell (0079083)
James A. Tate (0085319)
HELMER, MARTINS, RICE &
POPHAM CO., L.P.A.
600 Vine Street, Suite 2704
Cincinnati, Ohio 45202
Telephone: (513) 421-2400
Facsimile: (513) 421-7902
Email: jhelmer@fcalawfirm.com
jpopham@fcalawfirm.com
ecampbell@fcalawfirm.com
jtate@fcalawfirm.com

s/ Kelly Mulloy Myers
Kelly Mulloy Myers (0065698)
FREKING MYERS & REUL LLC
600 Vine St, Suite 900
Cincinnati, OH 45202
Telephone: (513)-721-1975
Email: kmyers@fmr.law

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Complaint was served as follows on December 2, 2020:

| **Real Party in Interest** | **Address and Service Type** |
|---|---|
| United States | ***Via Certified U.S. Mail & Hand Delivery***<br><br>Hon. David DeVillers<br>United States Attorney<br>221 E. Fourth Street, Suite 400<br>Cincinnati, OH 45202<br><br>***Via Certified U.S. Mail & Federal Express***<br><br>Hon. William P. Barr<br>Attorney General of the United States<br>United States Department of Justice<br>950 Pennsylvania Avenue N.W.<br>Washington, D.C. 20530 |
| Alaska | ***Via certified mail, return receipt requested***<br><br>Hon. Clyde Sniffen, Jr.<br>Acting Attorney General<br>Office of the Attorney General<br>Alaska Department of Law<br>1031 West 4th Avenue, Suite 200<br>Anchorage, AK 99501 |
| Colorado | ***Via Certified Mail, return receipt requested***<br><br>Hon. Phil Weiser, Attorney General<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, 10th Floor<br>Denver, CO 80203 |

| Real Party in Interest | Address and Service Type |
|---|---|
| Delaware | ***Via Certified U.S. Mail, return receipt requested***<br><br>Hon. Kathy Jennings, Attorney General<br>Delaware Department of Justice<br>Carvel State Building<br>820 N. French St.<br>Wilmington, DE 19801 |
| D.C. | ***Via Registered U.S. Mail, return receipt requested***<br><br>Hon. Karl A. Racine, Attorney General<br>400 6th Street NW<br>Washington, D.C. 20001 |
| Florida | ***Via Registered U.S. Mail, return receipt requested***<br><br>Hon. Ashley Moody, Attorney General<br>Office of Attorney General<br>State of Florida<br>The Capitol PL-01<br>Tallahassee, FL 32399-1050<br><br>and<br><br>Mr. Jimmy Patronis, Chief Financial Officer<br>Florida Department of Financial Services<br>200 East Gaines Street<br>Tallahassee, FL 32399 |
| Georgia | ***Via Certified Mail, return receipt requested***<br><br>Hon. Christopher M. Carr<br>40 Capitol Square, SW<br>Atlanta, GA 30334 |
| Illinois | ***Via Federal Express***<br><br>Hon. Kwame Raoul<br>Illinois Attorney General<br>Consumer Fraud Bureau<br>500 South Second Street<br>Springfield, IL 62701 |

| **Real Party in Interest** | **Address and Service Type** |
|---|---|
| Indiana | ***By Certified U.S. Mail, return receipt requested***<br><br>Hon. Curtis Hill, Attorney General<br>Office of the Indiana Attorney General<br>Indiana Government Center South<br>302 W. Washington St., 5th Floor<br>Indianapolis, IN 46204<br><br>and<br><br>Hon. Lori Torres, Inspector General<br>Office of the Inspector General<br>315 West Ohio Street, Room 104<br>Indianapolis, Indiana 46202 |
| Louisiana | ***Via Certified U.S. Mail, return receipt requested***<br><br>Hon. Jeff Landry, Attorney General<br>1885 North Third Street<br>Post Office Box 94005<br>Baton Rouge, LA 70804 |
| Maryland | ***Via Certified U.S. Mail, return receipt requested***<br><br>Hon. Brian E. Frosh<br>200 St. Paul Place<br>Baltimore, MD 21202 |
| Michigan | ***Via Certified U.S. Mail, return receipt requested***<br><br>Hon. Dana Nessel, Attorney General<br>G. Mennen Williams Building<br>525 W. Ottawa Street<br>P.O. Box 30212<br>Lansing, MI 48909 |
| Minnesota | ***Via Federal Express***<br><br>Hon. Keith Ellison, Attorney General<br>Office of Minnesota Attorney General Keith Ellison<br>445 Minnesota Street, Suite 1400<br>St. Paul, MN 55101-2131 |

| **Real Party in Interest** | **Address and Service Type** |
|---|---|
| New Hampshire | ***Via Federal Express***<br><br>Hon. Gordon J. MacDonald, Attorney General<br>NH Department of Justice<br>33 Capitol Street<br>Concord, NH 03301 |
| Oklahoma | ***Certified Mail, return receipt requested***<br><br>Hon. Mike Hunter, Attorney General<br>313 NE 21st Street<br>Oklahoma City, OK 73105 |
| Rhode Island | ***Via Federal Express***<br><br>Hon. Peter F. Neronha, Attorney General<br>150 South Main Street<br>Providence, Rhode Island 02903 |
| Tennessee | ***Certified mail, return receipt requested***<br><br>Hon. Herbert H. Slatery III, Attorney General<br>Office of the Attorney General and Reporter<br>P.O. Box 20207<br>Nashville, TN 37202-0207 |
| Texas | ***Registered Mail, return received requested***<br><br>Hon. Ken Paxton, Attorney General<br>Office of the Attorney General<br>PO Box 12548<br>Austin, TX 78711-2548 |
| Virginia | ***Federal Express***<br><br>Hon. Mark R. Herring, Attorney General<br>202 North Ninth Street<br>Richmond, Virginia 23219 |

/s/Erin M. Campbell
Erin M. Campbell